

April 30, 2020

**VIA ECF AND EMAIL**
Hon. Madeline Cox Arleo
United States District Judge
United States District Court
M.L.K. Jr. Federal Building & Courthouse
50 Walnut Street
Newark, NJ 07102

Re:    **United States v. Gary Basralian**
       **Docket No. 18 CR 515 (MCA)**
       **Our File No.  TBD**

Dear Judge Arleo:

Gary Basralian moves this Court to order compassionate release under the

First Step Act and 18 U.S.C. § 3582(c)(1)(A) on the grounds that his age, serious

medical conditions, and inability to protect himself against infection and probable

death from COVID-19, which has taken hold in his prison facility, constitute

extraordinary and compelling circumstances.

<u>**INTRODUCTION**</u>

The Coronavirus (COVID-19) pandemic has seized the world – and acutely

this country – in its grip. There is much fear and uncertainty, and rightly so. On

March 11, 2020, when the World Health Organization ("WHO") declared COVID-19

a global pandemic, there were more than 118,000 cases in 114 countries and 4,291

deaths. As of April 4, 2020, less than a month later, there are 1,159,515 confirmed

cases, and 62,376 deaths.[1] On April 3 – just a day earlier – Attorney General William Barr made a formal declaration of an emergency, acknowledging emergency conditions are materially affecting the functioning of the Bureau of Prisons ("BOP") and expanding the categories of prisoners eligible for release.

In the face of this pandemic, the plight of inmates and detainees across America is particularly dire. Prisons by nature are conducive to disease spread because they are contained populations living in confined, close quarters with limited hygiene and medical care. The social distancing, isolation, and strict hygiene necessary to contain the disease and protect the most vulnerable inmates is limited or impossible.[2] The only way to mitigate or reduce the potential death toll, given the hard realities of the large numbers of medically vulnerable and aged inmates and the conditions of confinement, is to decrease the jail and prison population by releasing the particularly vulnerable.[3]

---

[1] *Coronavirus COVID-19 Global Cases*, JOHN HOPKINS UNIV., https://coronavirus.jhu.edu/map.html (last visited April 4, 2020).

[2] *See* INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES, CENTERS FOR DISEASE CONTROL 2 (2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf [hereinafter *CDC Guidance*].

[3] *See* Jan Ransom & Alan Feuer, *"A Storm is Coming": Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, N.Y. TIMES (Mar. 20, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus- rikers-island.html (quoting the chief medical officer of New York City's jail system: "A storm is coming ....
Please let as many out as you possibly can.").

## I.   THE ADMINISTRATIVE EXHAUSTION REQUIREMENT MUST BE WAIVED BECAUSE OF ITS FUTILITY.

In response to the COVID-19 pandemic, courts have entertained motions for compassionate release under 18 U.S.C. § 3582(c)(1)(A), which authorizes courts to modify terms of imprisonment "upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf **or** the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier" to reduce the term of imprisonment upon determining that *extraordinary and compelling reasons warrant such a reduction.*"[4]

§ 3582(c)(1)(A) imposes a statutory requirement of exhaustion, but as the Court just recognized in *United States v. Perez*, "[e]ven where exhaustion is seemingly mandated by statute . . . the requirement is not absolute."[5]  There are generally three bases for waiver of an exhaustion requirement: First, where it would be futile, either because of agency decision-maker bias or "because the agency has already determined the issue."  Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief," including situations involving undue delay, where catastrophic

---

[4] 18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).
[5] No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020), quoting *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019).

health consequences can result. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice."[6]

In *Perez*, the district court in the Southern District of New York concluded that all three exceptions to the exhaustion requirement applied to the defendant's request, citing the ongoing COVID-19 pandemic, the inmate's health condition, and the irreparable harm delay would cause.[7] Other courts have made similar findings of waiver under the unique circumstances presented by the confluence of a serious and deadly pandemic with a defendant's medical vulnerability. *See e.g. United States v. Powell*, No. 1:94-cr-316(ESH), ECF No. 98 (D.D.C. Mar. 28, 2020) (finding administrative exhaustion futile, waiving § 3582(c)(1)(A)'s exhaustion requirement, and granting motion for compassionate release in light of COVID-19 pandemic and defendant's underlying health issues); *United States v. Latrice, Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at 2 (D. Conn. Apr. 2, 2020); *United States v. Agustin Francisco Huneeus*, No. 29 CR 10117 (IT) ECF Docket no. 642 (D. Mass. Mar.17, 2020); *United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket no. 84 (S.D.N.Y. Nov. 12, 2019).

The Third Circuit has similarly held the requirement of administrative exhaustion of claims "*may be excused if an attempt to obtain relief would be futile or where the purposes of exhaustion would not be served.*"[8]

---

[6] *Id.* at *2-4, quoting *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019).

[7] *See Perez*, No. 17cr513-3(AT), ECF No. 98 at 4.

[8] *Cerverizzo v. Yost*, 380 F. App'x. 115, 116 (3d Cir. 2010) (emphasis added), citing *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir. 2005); *Schandelmeier v. Cunningham*, 819 F.2d 52, 53 (3d Cir. 1986); *Gambino v. Morris*, 134 F.3d 156, 171 (3d Cir. 1998) (Roth, J., concurring); *Totaro v.Warden Fort Dix DCl*, 742 F. App'x 596 (3d Cir. 2018).

"[A]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further."[9] Application of this balancing principle is, and should be, "intensely practical."[10]

The Third Circuit's recent decision in *United States v. Francis Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) should not summarily preclude relief and does not require denial here. There, the Court of Appeals denied a remand to the district court for determination of Raia's motion for compassionate release, which had been denied by the district court on the basis that it no longer had jurisdiction because the government had filed an appeal of Raia's sentence. The Court of Appeals believed that remand would be "futile" because Raia failed to comply with § 3582(c)(1)(A)'s exhaustion requirement. The district court's indicative ruling did not mention the exhaustion requirement, and there was no factual or legal argument presented before that court, or the Court of Appeals, as to the exhaustion requirement. *Raia* cannot be read as holding that the exhaustion requirement cannot be waived, nor does it address under which circumstances waiver would be inappropriate. Because there is existing precedent for waiver of statutory administrative exhaustion requirements under particular circumstances, such as futility, or where the delay inherent in the process subjects the defendant to irreparable injury or prejudices him, there is no reason for this Court to adopt

---

[9] *West v. Bergland*, 611 F.2d 710, 715 (8th Cir.1979), *cert. denied*, 449 U.S. 821 (1990).
[10] *Bowen v. City of New York*, 476 U.S., at 484, 106 S.Ct., at 2032, citing *Mathews v. Eldridge*, 424 U.S. 319, 331, n.11(1976).

the holding in *Raia* as precluding relief in all circumstances where thirty days have not elapsed or the BOP's administrative appeal process has been exhausted. Since the exhaustion issue was not briefed below, the Court's brief discussion of the issue should be considered *dicta*.

As in *Perez*, we urge Your Honor to waive the exhaustion requirements of 18 U.S.C. § 3582. All three of the aforementioned exceptions apply here. The relief the BOP might provide will likely, because of "undue delay, become inadequate" and, importantly, Mr. Basralian will be unduly prejudiced by such delay."[11] Even a few weeks' delay carries the risk of catastrophic health consequences.

Mr. Basralian submitted a request to file an F-8 form requesting compassionate release because of his age and medical conditions on March 28, 2020. (Exhibit A, Request to BOP). On or about April 25, 2020, Mr. Basralian received a verbal denial but no formal, written response has been received to date, so Mr. Basralian cannot even begin the administrative appeal process. Since filing his application for compassionate relief, the number of cases of infected staff and inmates in BOP facilities nationwide has soared from 19 on March 26, 2020 to 259 infected staff and inmates on April 6, with 8 deaths. As of April 29, 2020, there are 27 inmates and 3 staff members at Camp Ft. Dix with the virus.[12] It should be noted that the camp has been closed to visitors since March 15, 2020,

---

[11] *Perez, supra*, quoting *Washington, supra*, 925 F.3d at 120-21; *Bowen v. City of New York*, 476 U.S. 467, 483 (1985) (irreparable injury justifies waiver of exhaustion requirements). *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even ... death").

[12] https://www.bop.gov/coronavirus/

so the only means for the virus to enter the facility is via staff interactions with each other and prisoners. As of this writing, the number of inmates in the BOP system with COVID-19 has exceeded 1500 and the number of staff has exceeded 300.[13] Given the aggressive spread of the disease, the inherent vulnerability of inmates to disease because of the nature of their incarceration, the lack of testing and the high numbers of asymptomatic carriers, the Court can presume that by the time thirty days has passed (as it is clear there will be no exhaustion of the BOP's notoriously slow appeals process), the prisons and their surrounding communities will be overwhelmed, inevitably leading to deaths. Succinctly, by then any access to the courts will be meaningless to vulnerable inmates like Mr. Basralian, who because of his age and underlying medical conditions is statistically more likely to contract the disease and die.[14]

Mr. Basralian is 72 years old and suffers from a host of medical conditions which predate his entry into prison (PSR §§ 83-87):

    a. High blood pressure and high cholesterol, first diagnosed in 1999. He was treated primarily with medication until he required surgery at Mount Sinai, New York, New York in February, 2015 to implant stents to improve blood circulation and stop fainting and dizziness episodes.

    b. He had a second surgery two months later, in April, 2015, to address his worsening heart disease, and this time had an aortic valve replacement

---

[13] https://www.bop.gov/coronavirus/
[14] PRELIMINARY ESTIMATES OF THE PREVALENCE OF SELECTED UNDERLYING HEALTH CONDITIONS AMONG PATIENTS WITH CORONAVIRUS DISEASE 2019 – UNITED STATES FEBRUARY 12-MARCH 28, 2020, CENTERS FOR DISEASE CONTROL COVID-19 RESPONSE TEAM 2 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf (demonstrating the majority of patients with one or more conditions suffered serious complications after being diagnosed with COVID-19, requiring hospitalization, sometimes in intensive care) [hereinafter *Underlying Health Conditions Study*].

and triple by-pass surgery, harvesting veins from his legs to rebuild his cardiac circulation system.

c. He is prescribed a host of medications to maintain his health, including: astorvastatin (to lower cholesterol), metroprolol tartrate (to regulate heart rate, and to treat angina, hypertension, and heart disease), sildenafil citrate (to treat pulmonary arterial hypertension), and Wellbutrin Sr (to treat major depressive disorder).

These underlying medical conditions create a higher risk for severe illness caused by COVID-19, as identified by the CDC. A study in the Journal of the American Medical Association (JAMA) released April 22, 2020 indicates that in the largest-to-date study of hospitalized COVID-19 positive patients (5700 patients), the number one co-morbid factor was hypertension (57% of hospitalized patients).[15] The top COVID-19 comorbidities listed in New York by the NY Times on April 16 include hypertension, diabetes, high cholesterol, and coronary artery disease – of which Mr. Basralian suffers from three.[16] Mr. Basralian's cardiologist, Dr. William Lyons, notes "Mr. Gary Basralian is at high risk of a grave outcome from a Covid-19 infection. As per the [Center for Disease Control guidelines], his risk of death is increased by his age (greater than 65) and coronary artery bypass surgery with 3 bypasses and aortic valve replacement in April, 2015. His cardiac condition will require life-long access to quality medical care, cardiac medication and cardiac testing."[17]

---

[15] Safiya Richardson, M.D., M.P.H., "Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area", JAMA (April 22, 2020) https://jamanetwork.com/journals/jama/fullarticle/2765184

[16] Danny Hakim, *Asthma is Absent Among Top COVID-19 Risk Factors, Early Data Shows,* NY Times (April 20, 2020) https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

[17] Letter of Dr. William Lyons, dated April 21, 2020, attached hereto as Exhibit B.

To further complicate issues, Mr. Basralian was scheduled to have an echocardiogram to monitor his heart condition, and although he was promised that the camp cardiologist would examine him and make the referral, that has not occurred. Studies have conclusively demonstrated that individuals with multiple comorbid conditions – such as Mr. Basralian – fare much worse than the average individual who may become infected.[18] The CDC has specifically identified the population most at risk of death from the disease to include adults 65 years or older and anyone with chronic medical conditions, such as long disease, heart disease, and diabetes.[19] Finally, and even more compelling, is that the BOP is ill-prepared to address the breath and severity of this healthcare crisis.[20]

An older inmate with simply diabetes, let alone multiple serious medical conditions, has been granted compassionate release on the basis of his heightened vulnerability to the disease. *See United States v. Rodriguez*, No. 2:03-cr-271, Doc. # 135 at 2 (E.D.P.A. Apr. 1, 2020) (granting compassionate release because for a diabetic inmate, "nothing could be more extraordinary and compelling than this pandemic"); *United States v. Colvin*, *supra* (defendant's diabetes substantially increases her risk of severe illness if she contracts COVID-19).

---

[18] *Id.*
[19] See. "People Who Are At Higher Risk," CDC (March 26, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.
[20] See, e.g. Danielle Ivory, "We Are Not A Hospital.": A Prison Braces for the Coronavirus, NY Times (March 17 2020), www.nytimes.com/2020/03/17/us (citing densely populated living conditions, dearth of soap, hand sanitizer, and protective gear and impossibility of maintaining safe distance between inmates and guards as reasons prisoners are at particular risk of infection.)

Given the rapid progression of the disease, the WHO's recent assertion that the virus may be airborne, and the Attorney General's emergency declaration that the rapid escalation of the disease impacts the BOP's ability to effectively function, the Court can comfortably determine that requiring Mr. Basralian to wait longer than he already has would be inadequate to prevent him from contracting COVID-19. Although 30 days have passed, Mr. Basralian has only received a verbal denial and nothing in writing. As such, he is in limbo as to which procedural direction he must take in order to pursue the requested relief. Enforcement of the administrative requirements under these circumstances would likely inflict the greatest irreparable injury to Mr. Basralian: his death.

## II.   THERE ARE EXTRAORDINARY AND COMPELLING REASONS JUSTIFYING COMPASSIONATE RELEASE.

18 U.S.C. § 3582(c) provides a path for defendants in "extraordinary and compelling circumstances" to be released from prison early. A sentence reduction under the statute must comply with the 18 U.S.C. § 3553(a) factors and any applicable policy statements issued by the Sentencing Commission. The Sentencing Commission provided a catch-all provision that allowed the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13 cmt. n.1(D). Extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing." § 1B1.13 cmt. n.2.

The Sentencing Commission's policy statement has not been amended since the First Step Act was enacted, even though the FSA amended § 3582(c) to allow the defendant to bring a motion for release, nor has it been replaced. U.S.S.G. § 1B1.13 cmt. n.1(D) allows only the BOP to determine what constitutes "extraordinary and compelling" which, as narrowly interpreted, renders the FSA's goal to increase the number of motions considered and granted impermissibly stunted. As such a growing body of district courts have held that they have discretion "to determine whether any extraordinary and compelling reasons other than those in U.S.S.G. § 1b1.3 cmt. n.1 (A)-(C) warrant granting relief."[21]

As these courts have found, "[t]he only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast variety of circumstances that may constitute "extraordinary and compelling.'" *United States v. Rodriguez*, No. 17-CR-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) (internal citation and quotation marks omitted). Unqualified "deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role." *Fox*, 2019 WL 3046086, at *3. Thus, the director's prior "interpretation of 'extraordinary and compelling' reasons is informative," but not dispositive.[22]

---

[21] *United States v. Brown*, 411 F. Supp. 3d 446, 449–51 (S.D. Iowa 2019), *citing United States v. Cantu*, N. 1:05-CR-458-1, 2019 WL 2498923 at *5 (S.D. Tex. June 17. 2019). *See also, United States v. Sotelo*, No 2:14-cr-00652-MAK, 2019 U.S. Dist. LEXIS 135051 at *22 (E.D. Pa. Aug. 7, 2019); *United States v. Mady Chan*, No. 96-CR-00094-JSW-13, 2020 WL 1527895 (N.D. Cal. Mar. 31, 2020); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5 (M.D.N.C. June 28, 2019); *United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019).

[22] *United States v. Adams*, No. 6:94-CR-302, 2019 WL 3751745, at *3 (M.D.N.C. Aug. 8, 2019).

While continuing to act in harmony with the § 3553 (a) factors, the Court has the discretion to determine that the confluence of Mr. Basralian's high risk medical conditions and the likely rapid escalation of the COVID-19 disease at Camp Ft. Dix create circumstances that qualify as extraordinary and compelling.[23] Second, the Court can determine that the specific nature of Mr. Basralian's confinement at Ft. Dix and the BOP's response to the pandemic thwart any efforts he may personally take to protect himself from the deadly disease. Third, the Court can find that Mr. Basralian's risk for contracting the disease and suffering severe complications like hospitalization is a risk that radiates outward, affecting the lives and health of other inmates, staff, and the surrounding community.

Considering Mr. Basralian's medical conditions, age, and the threat from *confirmed* COVID-19 cases in staff and inmates at Ft. Dix, and given the known rapid escalation of infection, Mr. Basralian meets the "extraordinary and compelling circumstances' standard of § 3582(c)(1)(A)(i).[24] He meets this standard whether under the more narrow definition of the Sentencing Commission, or the broader definition this Court may adopt.

It is an unfortunate reality that jails, prisons, and other closed settings carry with them a much greater risk of transmission for infectious diseases like COVID-

---

[23] *See United States v. Resnick*, No. 14 CR 810 (CM), 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (finding that defendant's high susceptibility to COVID-19 as a 65-year-old diabetic with liver disease falls in purview of catchall subdivision and warrants release).

[24] *See United States v. Rodriguez*, No. 2:03-cr-271, Doc. # 135 at 2 (E.D. P.a. Apr. 1, 2020) (granting compassionate release because for a diabetic inmate, "nothing could be more extraordinary and compelling than this pandemic"); *United States v. Colvin, supra* (defendant's diabetes substantially increases her risk of severe illness if she contracts COVID-19).

19.[25] Self- preservation and care in the context of a deadly, highly contagious virus in the prison facility consists of social distancing, strict compliance with hand washing and hygiene, the use of a mask, and isolation from exposed or infected inmates. Mr. Basralian can do none of these things.

On March 16, 2020, the BOP cancelled all educational programs, reducing the number of places the prisoners can congregate at Camp Ft. Dix. In the dining room, inmates would stand in line, according to my client, "like sardines", to get meals. A single soap dispenser was added to the bathroom in a meek effort to provide means to sanitize hands. As of March 22, religious services and classes were cancelled, and chairs in the library and other common areas were removed. As a result, inmates were restricted to congregating in their bunk areas where they are housed with 120 men less than 3 feet apart who use the same bathroom, while socializing and eating together. On March 23 the dining room, the largest room aside from the dorms, was closed. This further restricted inmates' ability to attempt social distancing and left them confined to limited, smaller areas without proper ventilation. Closing the dining room also forced inmates to each and sleep in the cramped dorms with 120 other individuals. By April 1, 2020, inmates were prevented from going outside to get fresh air. On April 3, 2020, prison guards were still not wearing protective gear when interacting with the inmates. As previously stated, visitors were disallowed from the facility approximately 2

---

[25] Theodore M. Hammett, PhD, *HIV/AIDS and Other Infectious Diseases Among Correctional Inmates: Transmission, Burden, and an Appropriate Response*, AM. J. PUBLIC HEALTH (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1470637/pdf/0960974.pdf.

weeks prior, so any contamination from the virus would have only come from BOP staff who were not wearing protective gear. The dorms are overcrowded and there is nowhere for inmates to go. Medical staff checking inmate temperatures require them to line up together. Inmates were not provided with sanitizer. On April 27, inmates were provided with a spray to use on the toilet seats, however the spray contained sulfonic acid, was only to be used outdoors, was supposed to be washed down before contact with the skin, and in turn caused burns to prisoners' skin.

Under current conditions, social distancing and adequate hygiene cannot be practiced nor followed in any sense. Nor can BOP isolate staff or inmates infected with COVID-19 because they do not have adequate testing kits or PPE and, as is now clear, a significant percentage of infected individuals are asymptomatic. Mr. Basralian simply cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus.

As public officials and the CDC have acknowledged, "[t]his pandemic is shedding a bright light on the extent of the connection between all members of society: jails, prisons and other detention facilities are not separate, but are fully integrated with our community." By design, jails are not medical facilities. For incarcerated individuals who are infected or very sick, the ability to properly treat them and save their lives is very limited.

The Court cannot rely on BOP's institutional expertise in this instance. There is widespread acceptance in the medical and prison policy community that

the pandemic will be particularly hard to control in prisons and undoubtedly deadly to its occupants. As of April 2, 2020, BOP has instituted a fourteen-day lockdown in facilities following the death of 4 inmates at Oakdale FCI in Louisiana – all in a weeklong period, all within days of admission to hospitals. The success of this stopgap measure in limiting the spread of COVID-19 in facilities – especially those like Ft. Dix, where there are already confirmed cases in both inmates and staff – has yet to be seen, but commonsense dictates that these new measures will largely be ineffective. The disease has undoubtedly infected more staff and inmates than "confirmed" numbers to date. Without access to regular testing, the numbers, as they are in the general population, are skewed significantly lower. Moreover, the BOP's Pandemic Influenza Plan – widely touted by the BOP and alluded to in response to a number of filings for compassionate release – is patently insufficient to control the disease without further expansion of the release of compromised and elderly inmates.

The numbers tell the tale. BOP's Pandemic Influenza Plan Phase Two, was introduced on March 13, 2020 to mitigate the spread of COVID-19, with national measures intended to "ensure the continued effective operations of the federal prison system and to ensure that the staff remain healthy and available for duty." That response consisted of suspension of social visits, legal visits and inmate movement for 30 days, as well as official staff travel, training, and volunteer visits. The BOP's implemented screening protocols for inmates only require brief examination for COVID-19 exposure risk factors and symptoms of newly arriving

15

BOP inmates, *not* testing. The plan called for asymptomatic inmates with exposure risk factors to be quarantined, and symptomatic inmates with exposure risk factors isolated and tested for COVID-19 per local health authority protocols. None of this addresses the danger to high-risk inmates like Mr. Basralian.

Indeed, these screening protocols have not prevented BOP facilities and staff from becoming infected with COVID-19, nor have they limited the spread in facilities with confirmed cases. On March 26, 2020, BOP Director Michael Carvajal released a press statement praising the Pandemic Influenza response plan and the "remarkably low" rates of infection, citing 10 inmates of out 146,000 and 8 staff members out of 36,000 staff testing positive. He declared these numbers were "a testament to our effective planning and execution to-date."[26] These low numbers now appear to reflect a lack of testing, which would have confirmed a growing rate of infection among BOP inmates and staff.

On April 2, only a *week* after Director Carvajal's press release, 2 inmates died at FCI Oakdale in Louisiana; and 18 inmates and 17 staff members tested positive for COVID-19.[27] The local union president, Ronald Morris, reported many more inmates were showing symptoms of infection. He specifically referenced the

---

[26] *Statement from BOP Director: BOP Response to COVID-19 Pandemic*, Bureau of Prisons (Mar. 26, 2020, 3:30 P.M.), https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.

[27] *Death Toll from COVID-19 at Oakdale Prison in Louisiana Continues to Climb*, N.Y. Times (Apr. 2, 2020), https://www.nytimes.com/reuters/2020/04/02/us/02reuters-health-coronavirus-prisons.html; Luke Barr, *Federal Prisons Facing Shortages of Resources Amid Coronavirus Outbreak*, ABC NEWS (Apr. 1, 2020, 4:16 P.M.), https://abcnews.go.com/Health/federal-prisons-facing-shortages-resources-amid-coronavirus-outbreak/story?id=69920966; Michael Balsamo & Michael R. Sisak, *Federal Inmates to be Locked in Cells for 14 Days Amid **Virus***, A.P. News (Apr. 1, 2020), https://apnews.com/c6c546586b9d3769b10ce2ab2bffbbdc.

lack of masks, gowns, and face shields; as in other parts of the country, the facility lacked the means to test and protect against the virus.

By April 4, the death rate at FCI Oakdale tallied 5, with 2 additional deaths at FCI Elkton, another low security prison in Ohio. The trajectory of deaths at Oakdale, which is very similar to Ft. Dix in terms of its structure (dormitory style versus individual cells and pods), poses a chilling prospect of Ft. Dix's future and, in particular, the safety of high-risk inmates like Mr. Basralian.[28] Less than a week after Director Carvajal's press release, on April 1, 2020, the number of confirmed cases publicly declared on the BOP website was 29 inmates and 30 staff members. A day later, April 2, 2020, that number had risen to 75 inmates and 39 staff members infected. On April 4, 2019, *just two days* later the total number of confirmed infected cases rose to 120 inmates, and 54 staff. **As of April 6, the numbers have increased to 196 inmates, 63 staff and 8 deaths.** It has become so serious, that on March 31 a union for federal prison employees filed a complaint

---

[28] The first inmate to die, Patrick Jones, presented with a persistent cough on March 19 and was transported to a local hospital for treatment and evaluation. On March 20, the next day, he was placed on a ventilator. On March 29, he passed away. BOP acknowledged that he was only 49 years old, but had "long term, preexisting medical conditions, which the CDC lists as risk factors for developing more severe COIV19 disease." Four days later, on April 2, 2020, there were two additional deaths at Oakdale. 57-year-old James Wilson taken to a hospital with respiratory failure on Monday, put on a ventilator on Tuesday, and was pronounced dead on Wednesday, along with Nicholas Rodriguez, 43. David Townsend, 66, died Thursday. *See* Keegan Hamilton, *4 Inmates Dead from Coronavirus as Outbreak Spirals at Louisiana Federal Prison*, VICE (Apr. 2, 2020, 12:07 P.M.), https://www.vice.com/en_us/article/m7qdvq/4-inmates-dead-from-covid- 19-as-outbreak-spirals-at-louisiana-federal-prison; Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana*, WASH. POST (Mar. 29,2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html. By April 4, there was a fifth death at Oakdale and two at FCI Elkton.

with OSHA, in part asserting that the BOP has failed to mitigate the spread of the virus in facilities, failed to maintain social distancing and failed to provide protective equipment. https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-danger-spreading-covid-19-union-says/164390/.

On April 6, Attorney General William Barr told federal prosecutors to take the COVID-19 pandemic into account when deciding whether to seek pretrial detention for criminal defendants. The AG stated in his memorandum, "[e]ven with the extensive precautions we are currently taking, each time a new person is added to a jail, it presents at least some risk to the personnel who operate that facility and to the people incarcerated therein," the attorney general said. "It also presents risk to the individual being remanded into custody — **risk that is particularly acute for individuals who are vulnerable to a serious infection.**" (emphasis added). Barr's memo also said prosecutors should use the same analysis when evaluating virus-related petitions for release from incarcerated defendants.

The facts lay bare BOP's assurances of "strategic planning" do not include widespread testing and contact tracing. Neither the screening protocols, the professed testing protocol, nor the quarantine method espoused will accurately or effectively identify and segregate inmates or staff with COVID-19, as between 25 and 40% of people may be asymptomatic carriers.[29]

---

[29] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus* Spreaders, N.Y. Times (Apr. 1, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html?auth=login-email&login=email.

### III.    MR. BASRALIAN DOES NOT POSE A THREAT TO THE COMMUNITY AND HIS REHABILITATION SHOULD BE CONSIDERED IN GRANTING HIS COMPASSIONATE RELEASE.

The factors this Court must consider under 18 U.S.C. § 3553(a) are well-known:

1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

2)  the need for the sentence imposed—

    a)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b)  to afford adequate deterrence to criminal conduct;

    c)  to protect the public from further crimes of the defendant; and

    d)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3)  the kinds of sentences available;

4)  the kinds of sentence[s] and the sentencing range established for--

    a)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission ...;]

    b)  any pertinent policy statement guidelines [issued by the Sentencing Commission ...;]

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

Mr. Basralian was not convicted of a violent offense and has no prior involvement with the criminal justice system. He received a 70-month sentence, a severe sanction considering both his age and then-existing physical state. He has been incarcerated since November 2019. In some respects, his incarceration has been more severe than that experienced by younger, healthier inmates. He has had frequent health issues, and his chronic, life-threatening conditions remain largely uncontrolled. Reduction of his sentence under these extraordinary circumstances, which could not have been contemplated at the time of sentencing, does not diminish the original sentence and its intended purposes. Indeed, the Court can impose strict terms of lifetime supervision, or probation, to serve as a deterrent and sanction. Moreover, there are alternatives to reducing Mr. Basralian's sentence by allowing him a non-transfer furlough to home confinement until such time as the prison system is better able to care for those in Mr. Basralian's condition.

Mr. Basralian's age, prior history, and behavior during his incarceration make him an extremely low risk for recidivism. During his time in prison, he became Head Librarian wherein he established an informal book club and made the library into a welcoming space for individuals to meet and exchange ideas. He also was scheduled to start teaching a conversational Italian class in February but

that was postponed to March and now indefinitely. He has taken 3 levels of OSHA classes and the examination for certification; classes on safety in the work place, including PPE, chemicals, toxins and hazmat; blueprint reading for construction and mechanical design; and, ServSafe on food safety (only half the course was complete due to educational programs being suspended). He has had absolutely no physical or verbal altercations with inmates or staff members during his incarceration.

Mr. Basralian does not pose a danger to society if released. Statistically, his age makes him a very low risk for recidivism. Should he be released, Mr. Basralian initially will reside at his family's home located at 3208 Seacrest Drive, Lavallette, NJ 08735. The cabinets and refrigerator have been stocked in hopes of Mr. Basralian's arrival and a doctor and nurse practioner have been retained to monitor his health vis-à-vis temperature and symptoms of COVID-19. Following a 14-day self-imposed quarantine, Mr. Basralian will relocate to live with his wife in an apartment located at 71A Forest Drive, Springfield, NJ 07081. Mr. and Mrs. Basralian will be the home's only occupants.

Mr. Basralian's health and safety remain his family's primary concerns. His sister, Karen, has written several letters to the Warden stating her concerns with the deteriorating environment at the Camp and Mr. Basralian's chronic medical issues putting him directly in harm's way.[30] The family will be providing financial support and has expressed willingness to pay for any medical needs that arise.

---

[30] See Letters, attached hereto as Exhibit C.

Although Mr. Basralian has been incarcerated for a short period of time, the 70-month sentence he received reflects the seriousness of the offense, deters criminal conduct, and protects the public under § 3553(a). This is not diminished by release of Mr. Basralian to home confinement, with or without electronic monitoring, under the extraordinary circumstances presented here. If not released, the 70-month sentence would more likely than not become a death sentence due to Mr. Basralian's chronic health conditions and the uncontrollable spread of COVID-19 at Ft. Dix.

The Honorable U.S. District Judge James S. Gwin observed in his findings relating to FCI Elkton that "discharge of incarcerated persons from the physical confines of Elkton, not necessarily release from custody...where release options may include but are not limited to : release to parole or community supervision; transfer furlough (as to another facility, hospital, or halfway house); or non-transfer furlough, which could entail a release person's eventual return to Elkton once the pandemic is over and the viral health threat abated" could address the health crisis while still maintaining control over those under BOP supervision.[31] There are clearly options for the court and the BOP to address the current health crisis and in particular those like Mr. Basralian who are medically vulnerable.

---

[31] See Waler Pavlo, *Federal Judge In Ohio Says FCI Elkton Meets "Cruel and Unusual Punishment" Standard,* Forbes, April 23, 2020, https://www.forbes.com/sites/walterpavlo/2020/04/23/federal-judge-in-ohio-says-fci-elkton-meets-cruel-and-unusual-punishment-standard/#6db4899020d4.

## CONCLUSION

Mr. Basralian and inmates like him are unable to practice social distancing or proper hygiene to prevent being infected with COVID-19. Unlike the public, he cannot isolate himself and limit contact with others; he cannot wear a mask, wash his hands ten to twenty times a day, or use hand sanitizer. He cannot cabin himself off from asymptomatic prisoners or staff, and there is no testing available to quell the growing threat. Ft. Dix has confirmed cases. It is only a matter of time before it has confirmed deaths, and inmates like Mr. Basralian become a statistic in the war against the COVID- 19 pandemic.

In light of the foregoing, we respectfully ask the Court to exercise its discretion and save Mr. Basralian from an almost certain death.

Respectfully submitted,

REM KATCHER LAW GROUP, P.C.

Tamra Katcher, Esq.
NJ Attorney ID #019251999
tkatcher@remlawgroup.com

Enclosures
cc:     Courtney A. Howard, AUSA (via email and ECF)
        Gary Basralian

# EXHIBIT A

BP-A0148
JUNE 10                                  INMATE REQUEST TO STAFF CDFRM

U.S. DEPARTMENT OF JUSTICE                              FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member)<br>Warden David E. Ortiz | DATE:<br>March 28, 2020 |
|---|---|
| FROM:<br>Gary Basralian | REGISTER NO.:<br>71610-050 |
| WORK ASSIGNMENT:   Camp Librarian | UNIT:.<br>Camp - B |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Attorney General William Barr has directed the Bureau of Prisons to
immediately release elderly, non-violent inmates who are most
susceptible to the COVID-19 virus.  He also indicated the use of
enhanced compassionate release to affect said release faster.

I am 73 years old and diagnosed by medical staff with chronic coronary
artery disease in addition to suffering with chronic gastritis and
scarred lungs.  I also underwent triple by-pass surgery and an aortic
valve replacement; my immune system is subject to compromise.

As such, I am requesting immediate release to home confinement for
health and compassionate reasons.

Respectfully submitted
Gary Basralian

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                            Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Privacy Folder    **SECTION  6**

# EXHIBIT B



**ENGLEWOOD HEALTH**
PHYSICIAN NETWORK

Cardiovascular Consultants
of North Jersey

777 Terrace Avenue, Suite 311
Hasbrouck Heights, NJ 07604-3110

Tel: 201-288-4252
Fax: 201-288-7172

englewoodhealthphysicians.org

CARDIOVASCULAR

Evan D. Sehgal, MD,
F.A.C.C.
*Diplomate, American Boards
of Internal Medicine &
Cardiology*

William J. Lyons, MD,
F.A.C.C.
*Diplomate, American Boards
of Internal Medicine &
Cardiology*

Lane J. Benoff, MD
*Diplomate, American Boards
of Internal Medicine &
Cardiology*

Ramin S. Hastings, MD
*Diplomate, American Boards
of Internal Medicine,
Cardiology & Interventional
Cardiology*

April 21, 2020

To Whom It May Concern:

Mr. Gary Basralian is at high risk of a grave outcome from a Covid-19 Infection.  As per the CDC, his risk of death is increased by his age (greater that 65) and coronary artery bypass surgery with 3 bypasses and aortic valve replacement in April 2015.  His cardiac condition will require life-long access to quality medical care, cardiac medication and cardiac testing.

Mr. Basralian is an appropriate candidate for home confinement as he is in a low-minimum risk security facility.  He is deemed non-violent in terms of his behavior in and out of prison.  Home confinement will help mitigate his risk of infection and death.  It would also help by reducing overcrowding, improve his access to soap, hand washing and social distancing.

Covid-19 infection in prison is a multi-state issue including New Jersey.  Preventing suffering and unnecessary death for prison staff and prisoners while protecting the public are the goals of Federal memos and programs for the last 2 months.  Please consider his release.

Sincerely,

William J. Lyons, MD

WJL/er

# EXHIBIT C

①

## ExecAssistant@bop.gov

March 29, 2020

Dear Warden Ortiz:

My brother, Gary J. Basralian (71610050), is in your Camp facility at Fort Dix.
I – and my family – are very concerned about Gary's health and the potential
spread of the COVID-19 virus into your Camp facility. The best of intentions
cannot keep this virus at bay during this pandemic.

Gary is nearly 73 years old and has been diagnosed by medical staff with chronic
coronary artery disease in addition to suffering with chronic gastritis and scarred
lungs. He also underwent triple by-pass surgery and an aortic valve replacement;
his immune system is subject to compromise. If he contracted this virus, his life
could be in danger.

Attorney General William Barr has directed the Bureau of Prisons to immediately
release elderly, non-violent inmates who are most susceptible to the COVID-19
virus. He also indicated the use of enhanced compassionate release to affect
these releases faster.

These men in the camp live in close quarters and in an old facility and the best of
intentions will not stop a virus which can be easily transmitted once exposed.

I hope the directives of the Attorney General will be implemented at your facility
as soon as possible and Gary and others like him will be released before
any COVID-19 cases hit the Camp.

Regards,

Karen M. Topjian
38 Regency Circle
Englewood, NJ 07631
201-394-8370
mcmdesigns@gmail.com

Regarding my brother, Gary Basralian 71610050:  he fits the description of the elderly with a severe medical condition. I do not know what provisions you are taking but the For Dix facility is old and the men are living in close quarters. With limited medical staff and equipment, how will the BOP care for those who come down with the virus? It could be a nightmare if even one person gets the virus.

This virus has no care about the length of a sentence or where one is in that process. It hits young and old but especially the elderly with weakened immune systems.

As a family, we are prepared to follow BOP directives if Gary is sent home for confinement. I already have a sister-in-law in the hospital with COVID-19. It is difficult to fight - even in a fully equipped, fully staffed medical facility.

I would like to hear what you can do for any affected inmates if the virus comes into the facility. Will you be outlining this in a follow up email.

In summary, our family has been closely following what AG Barr has authorized and feel that Gary Basralian fits in with the guidelines outlined for home confinement. Please, do not put Gary, or other similar inmates with medical conditions at any unnecessary risk. Time is of the essence.

Thank you for your consideration.

Karen Topjian
mcmdesigns@gmail.com

Karen M. Topjian, ASID, NJCID, CAPS, CGP
American Society of Interior Designers
NJ Certified Interior Designer #058
Certified Aging in Place Specialist
Certified Green Professional
National Kitchen and Bath Association, Member

MCM Designs
T: 201-804-5381
C: 201-394-8370
www.mcmdesigns.com
mcmdesigns@gmail.com



April 5, 2020

Dear Warden Ortiz:

I appreciate the difficult position you are in but I believe my brother, Gary Basralian 71610050, is a strong candidate for home confinement due to COVID-19 because of serious existing medical conditions.  Gary, who will be 73 in July, has had open-heart surgery (triple bypass and new aortic value), has gastritis, a low immune system and scarred lungs and shortness of breath.  These illness fit Gary into the directives made by Attorney General Barr on March 27th. As a result of his comments, we think Gary's release for home confinement is justified. We are very concerned for his health amidst this crisis.

> *Attorney General William Barr has directed the Bureau of Prisons to immediately release  elderly, non-violent inmates who are most susceptible to the COVID-19 virus. He also indicated the use of enhanced compassionate release to affect said releases faster.*

I have relatives who have this virus and it is very difficult to care for them. They are isolated and are facing possible death, alone.  I am fearful that unless you get Gary and other men like him out, one case of the virus at the camp will doom them to the horrors of illness in a substandard facility. Who will care for them? Will you or your staff tend them? Will you leave them to the minimal care of the few medical personal you have? Or will you ask other prisoners to care for them? Who will provide the nourishment they need and who will clean up the bathrooms, clean their sheets, wash their clothes when their fevers reach 104 degrees, or protect the other inmates from the constant cough that is part of this virus? And how will you separate them in the large sleeping room they now habitat when one or two, or ten get sick? The pattern can go on for months.

We all know this virus is very contagious and one infected person will lead to many when they live in close quarters.

The men in the Camp are our brothers, fathers, and sons and they, no matter what they have done, are loved by their families and deserve the care that the general public is entitled to.  You are their protectors, and are responsible for their care. I have been to the Camp at Fort Dix many times and know that this is a very old building, lacks ventilation, AC and the men sleep close quarters. If there is an outbreak in the camp, the consequences can be overwhelming.  And the continual confinement without exercise and fresh air becomes demoralizing. Add this to the fear the inmates have for their own families on the outside as well as the unknowns of their own situation, you have morale problems. We on the outside are facing this ourselves as we stick to home confinement, so I know the issues well.

Sir, waiting to send men for home confinement will cause bigger problems as times go by.  These men are now on their second quarantine. The first one started on March 16th. No visitors were allowed in so the only people who could communicate the virus would be staff. Now AG Barr says to send the men home after another 14-day confinement.  He probably doesn't know that this is the 2nd go-round.  I do not understand the resistance

of the BOP to sending these non-violent inmates' home immediately for confinement. Surely, if there is any contagion at this point, the BOP must take full responsibility.

We implore you not to wait to get these men out of a potentially dangerous environment. We live in unprecedented times and, as a nation, are facing illness and economic upheaval that only working together will solve. Please work with us.

Regards,

Karen Topjian
mcmdesigns@gmail.com

cc:
Donald J. Trump, President
William Barr, Attorney General
Michael Carvajal, Director Bureau of Prisons
Senator Cory Booker, NJ
Senator Robert Menendez, NJ
Senator Gerald Nadler, NY



Karen Topjian <mcmdesigns@gmail.com>                    Tue, Apr 7,
                                                        7:24 PM

to FTD/Exec

April 7, 2020

Re: Gary Basralian 71610050

Dear Warden Ortiz:

Thank you for your prompt reply to my previous email.

I have visited the BOP website as you suggested. My brother, Gary
Basralian saw his Case Worker, Ms. Wright, on March 30th and presented
her with the paperwork that is required for Home Confinement.  He, at that
time, also discussed his health with her, going over the impact this virus
will have on his life. He has been seen by the medical staff at the Camp
concerning his health issues and was due for heart tests this month.

Presently, inmates are being reviewed for suitability and eligibility for home
confinement based upon their age and medical history. We hope you will
agree that Gary is a candidate for home confinement based upon the most
recent directives of Attorney General William Barr. Gary will be 73 in July
and has had triple by-pass surgery with a new aortic valve replacement,
scarred lungs, pneumonia twice this year, shortness of breath and gastritis.

For your information, I have a family member dying of this virus at the
present time and others ill with it as well.  I do not want my brother to
become a victim of this virus, especially when there is a way to protect his
life with home confinement. We are grateful to the BOP professionals and
the Attorney General for being proactive by directing and implementing
immediate home confinement for vulnerable inmates like Gary.  We all
know that "time is of the essence".

We understand you are deeply concerned and we hope that you understand
our worry. I implore you to reach out to  Ms. Wright and rule in favor of
Gary's request.

With regards,

Karen Topjian
mcmdesigns@gmail.com


Attached - Inmate Request for Immediate Home Confinement



April 11, 2020

Dear Warden Ortiz,

This is my fourth letter to you regarding my brother, Gary Basralian, 71610050. I appreciated that you have responded to my past emails through your Executive Assistance and assume that you understand the urgency of my requests. Unfortunately, to date, I have not seen any movement towards home confinement although Gary's medical record outlines, in detail, his conditions that led to these requests. Gary fits into the directives of the Attorney General's directives.

Gary will be 73 in July, and is in poor physical health. He has tried hard to be a good model inmate, working most recently in the Library and preparing a course in Italian to teach other inmates. He is a bright man with great potential, even at his age, to contribute to society.

I realize it is difficult running a prison where you have the full gamut of criminal crimes. But, the Camp functions because of the non-violent nature of the inmates and the fact that most of the crimes are considered 'white collar crimes'. These men are not a danger to society – certainly my brother is not!

This week I lost my sister-in-law to the virus; her husband also has the virus and is failing. And now, my brother is in the cross-hairs of this virus and there is little being done that follows Federal guidelines to ensure his health safety. This virus is horrid – high temperatures, coughing, dehydration, fatigue, to name a few of the effects. And it can last several weeks. The care required is more than letting someone lie in their bed. They need to be fed, given water, walked so the lungs won't fill up and they need cleanliness. Gary already has compromised lungs due to scarring and last year, two bouts of pneumonia. He has had open-heart surgery and other conditions that are in his report. His Case Manager, Ms. Wright, should have given you this report since it was filed on March 30th.

With the virus now in the camp, I ask you – will you and your staff take care of these men? Will you bring in the medical staff to do this? Will you give them the proper nutrition to see them through these difficult days. They can't be isolated and shunted away, waiting for the virus to break. They will need care.

Mid-March, visiting was stopped. Other than the phone calls and emails, we have had no contact with Gary. To be frank, there was NO way these men could get the virus except through camp staff. And, until last week, the staff was not in protective gear and it was the first-time masks were issued to the inmates. Also, there is no social distancing – impossible in a sleeping situation with bunk beds and spacing of 3' between them. We in the public have been practicing the Federal guidelines for over three weeks – yet your Camp has not even adhered to it at this junction. While I don't know the full layout of the camp facility, I do know that, under these dire circumstances, the visiting room could have been turned into a sleeping room – thereby allowing more distance and better ventilation for the men. There is always a way to improve.

Warden Ortiz, you hold the lives of these men in your hands. We the families of these men depended upon the BOP and you to follow the directives of the Attorney General Barr. We, at

home, listen attentively to everything that comes from the AG. We know that inmates over 60, with medical conditions, were to go to home confinement as of March 27th. AG Barr removed the restriction of the length of the sentence as a component of the release. At that point – there were, I believe, no cases of this virus in the camp. Now, unfortunately, they are four confirmed cases and two pending. What comes next?

We can provide my brother a safe place to be in quarantine. He was and is currently not showing symptoms of the virus. He needs to be released to home quarantine immediately so that he can stay safe. And, if by chance he gets the virus when at home, he will not pass it along to others in the camp. Each day that he is left in the camp, the greater the risk.

Gary is one of six siblings. We all are deeply affected by his incarceration. Yet, we are family, and know his worth. We will fight for his safety under all circumstances. Although Gary understood what his sentence was, he did not think that he could be subjected to this level of fear and concern. We were assured by the judge when he was sentenced that the prison system would provide good medical care. Unfortunately, this is not the case.

I implore you to release Gary so he can be quarantined at home while under home confinement. The camp is a dangerous place for a person with serious health concerns. Being at home can potentially spare him the horrors of this illness and potentially, too, save his life.

Sincerely,

Karen Topjian

mcmdesigns@gmail.com
201-394-8370

cc:
William Barr. Attorney General US
Michael Carvajal, Director, BOP
Cory Booker, Senator NJ
Robert Menendez, Senator NJ
Philip Murphy, Governor NJ

3