

December 1, 2020

**VIA ECF AND EMAIL**
Hon. Madeline Cox Arleo
United States District Judge
United States District Court
M.L.K. Jr. Federal Building & Courthouse
50 Walnut Street
Newark, NJ 07102

**Re:   United States v. Gary Basralian**
      **Docket No. 18 CR 515 (MCA)**
      **Our File No.  21248**

Dear Judge Arleo:

Gary Basralian moves this Court to order compassionate release under the First Step Act and 18 U.S.C. § 3582(c)(1)(A) on the grounds that his age, serious medical conditions, and inability to protect himself against the potentially fatal consequences of infection from COVID-19 warrant such relief. As we enter the next surge in the virus, with more than 1 million new cases in the United States *every week*, the medical catastrophe of the pandemic is upon us, especially in prisons, and constitutes extraordinary and compelling circumstances upon which to grant relief.

infected inmates and staff out of <u>all</u> correctional facilities in the Northeast or Mid-Atlantic region, only behind two New Jersey state facilities.[6] (Notably, per the New York Times, FCI Fort Dix has 441 positive cases, substantially higher than the ~250 claimed by the BOP). The Honorable Berle M. Schiller, U.S.D.J, Eastern District of Pennsylvania, acknowledged that there is a lack of testing at Fort Dix such that the reported results do not accurately reflect the current situation.[7]

These skyrocketing numbers demonstrate an out-of-control health risk to the inmates. Several courts have concluded that "the threat of COVID-19 to those in prison…constitutes an extraordinary and compelling reason for compassionate release." *United States v. Pacheco*, No. 12-CR-408 (JMF) (S.D.N.Y., 7/29/20).

Lawmakers have demanded answers from the BOP, but that has not changed the problem within the prison.[8] In response, judges around our district and others whose defendants have been sent to FCI Fort Dix, have intervened to protect the health of the incarcerated where the BOP is clearly unable to do so. The following list of some of the recent grants of compassionate release or temporary furlough show how judges have used this authority.

- *U.S. v. McCalla*, 2020 WL 3604120 (D.N.J., July 2, 2020)(granting compassionate release to Fort Dix inmate with chronic asthma, high blood pressure, obesity, and chronic renal disease);
- *United States v. Rodriguez*, 00-Cr.-762 (JSR)(S.D.N.Y., Sept. 30, 2020)(granting resentencing to 30 years down from life-

---

[6] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html
[7] *United States v. Eric Sijohn Brown*, 2:13-cr-00176-BMS (EDPa, September 29, 2020).
[8]https://www.bakersfield.com/ap/national/covid-outbreak-infecting-hundreds-at-fort-dix-is-escalating-crisis-nj-senators-warn/article_8efd91a5-cd07-5a2b-ba7c-8707415de3f4.html; See also https://gothamist.com/news/240-prisoners-sick-with-covid-inside-fort-dix-prison.

without-parole to Fort Dix inmate convicted of torture and murder-for-hire of a government informant in furtherance of narcotics conspiracy; inmate had no infractions in 20 years of imprisonment)

- *U.S. v. Robinson*, 2020 *WL* 4041436 (E.D.Va. July 17, 2020)(granting compassionate release to Fort Dix inmate with high blood pressure);
- *U.S. v. Hayes*, 2020 *WL* 4001903 (E.D. Mich. July 15, 2020) (granting compassionate release to Fort Dix inmate with obesity, asthma, sleep apnea);
- *U.S. v. Amaro*, 2020 *WL* 3975486 (S.D.N.Y., July 14, 2020) (granting compassionate release to Fort Dix inmate with medical and mental health conditions);
- *U.S. v. Hernandez*, 2020 *WL* 38993513 (S.D.N.Y., July 10, 2020) (granting compassionate release to Fort Dix inmate with obesity, COPD, and diabetes);
- *U.S. v. Browne*, 2020 *WL* 3618689 (D. Mass., July 2, 2020) (granting compassionate release to Fort Dix inmate with obesity, hypertension, asthma, hyperlipidemia, diabetes, and pancreatitis);
- *U.S. v. Debartolo*, 2020 *WL* 3105032 (D.RI., June 11, 2020) (granting compassionate release to Fort Dix inmate with chronic kidney disease, and hypertension);
- *U.S. v. Anderson,* 2020 *WL* 2849483 (S.D.N.Y., June 2, 2020) (granting compassionate release to Fort Dix inmate with obesity);
- *U.S. v. Smith*, Crim No. 15-44 (W.D. Pa., June 26, 2020) (granting compassionate release to Fort Dix inmate with sarcoidosis);
- *U.S. v. Woodward*, Crim No. 12-105(RAJ)(E.D.Va. June 26, 2020) (granting compassionate release for Fort Dix inmate with obesity, heart disease, and diabetes);
- *U.S. v. Al-Jumail*, Crim No. 12-20272(DOH) (E.D. Mich, 5/12/20) (granting compassionate release to Fort Dix inmate with heart disease, diabetes, and retinal disease);
- *United States v. Pena*, 2020 *WL* 2301199 (S.D.N.Y., May 8, 2020) (granting compassionate release to Fort Dix inmate with high blood pressure);
- *United States v. Williams*, 2020 *WL* 1974372 at *4 (D. Conn. Apr. 24, 2020) (granting compassionate release to Fort Dix inmate with diabetes and high blood pressure);
- *United States v. Logan*, No. 1:12-CR-308, Dkt. No. 179 (N.D.N.Y., Apr. 22, 2020) (granting compassionate release to Fort Dix

4

## INTRODUCTION

COVID-19 has taken a dramatic turn for the worse in the United States and worldwide. As of November 23, 2020, there are over 12 million cases of Coronavirus, up nearly 10% in the last week alone, and 250,000 deaths just in the United States.[1] Worldwide there are over 58 million cases and 1.3 million deaths.[2]

Nationwide, the Bureau of Prisons is reporting that to date 3,891 federal inmates and 1,264 staff members have tested positive (up from 2,455 inmates and 981 staff members just 12 days ago, a 58% and 28% increase, respectively).[3] These numbers demonstrate that, despite the efforts of the BOP, the surge in infections inside prison walls greatly exceeds the surge in society. The numbers at FCI Fort Dix, where Mr. Basralian is housed, have grown astronomically since mid-September. According to the BOP website, on September 21, 2020, there were no COVID positive staff or inmates.[4] On September 24, there was 1 case; September 29 - 2 cases; October 12 - 5 cases; October 14 - 9 cases; October 19 – 9 inmates and 2 staff; October 26 – 17 inmates and 6 staff; October 27 – 32 inmates and 8 staff; October 28 – 57 inmates and 8 staff; October 20 – 165 inmates and 8 staff; November 11 – 229 inmates and 12 staff; and November 23 - 246 inmates and 18 staff (an increase over the October 26 numbers of 1,447% and 300%, respectively).[5] As of today, FCI Fort Dix has the third highest concentration of

---

[1] The New York Times, nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[2] *Id.*
[3] www.bop.gov/coronavirus
[4] *Id.*
[5] *Id.*

2

inmate with diabetes, hypertension, hypercholesterolemia, and coronary artery disease).;

- *United States v. Dorian Avery*, No 1:14-CR-810 (JMF) (S.D.N.Y., Nov. 16, 2020) (granting compassionate release to Fort Dix inmate with severe obesity).

Mr. Basralian has seen first-hand the BOP's inaccurate reporting of the numbers. He observed that men are moved to different parts of the facility in order to reduce the publicly reported numbers, and some areas of the facility are not even being tested.[9] Corrections officers and medical staff work in various units in the facility throughout their workday leading to cross-contamination.[10] Further, the BOP did not institute a facemask policy until August 27, 2020 and that policy is not strictly followed.[11] To add salt to the wound, inmates from the virus-infested Elkton, Ohio facility were transferred to Fort Dix.[12] Although the BOP denies that the drastic increase in COVID-positive inmates relates to this transfer of prisoners, the numbers and the timeframe do not lie. Beginning on September 28, 298 inmates from Elkton were transferred to Fort Dix.[13] On October 9, few positive cases were reported at the facility.[14] As of November 4, 218 out of 231 inmates in one building had tested positive.[15] Notwithstanding the BOP's outright denial of

---

[9] See October 4, 2020 email by Gary Basralian, attached hereto as Exhibit A; and September 23, 2020 email by Gary Basralian, attached hereto as Exhibit B.

[10] See November 9, 2020 email by Gary Basralian, attached hereto as Exhibit C.

[11] *U.S. v. Brown, supra.*

[12] Joe Atmonavage, *There is 'no evidence' that transferring sick inmates to N.J. prison led to COVID-19 outbreak, official says,* NJ.com, Nov. 11, 2020, https://www.nj.com/news/2020/11/there-is-no-evidence-that-transferring-sick-inmates-to-nj-prison-led-to-covid-19-outbreak-official-says.html.

[13] *Id.*

[14] *Id.*

[15] *Id.*

the connection, the increase in the numbers of the infected can only be sourced to the staff (approximately 500) and the newly introduced inmates. Since there is no regular testing of staff or inmates (beyond the occasional temperature check), there is no barrier between the staff who enter the facility every day, move freely between all areas of the prison interacting with all the staff and inmates, and then leave the facility every day to move freely and interact with their whole community, only to repeat the process every day. Among the newly infected at FCI Fort Dix are inmates in the Special Housing Unit. These inmates are isolated from each other and have no contact with anyone other than their prison guards, and yet they are showing a recent surge in infections, demonstrating that the guards are the source of infection.[16]

The unique environment of the prison system leaves inmates as sitting-ducks waiting for the virus to spread to them and Fort Dix and the BOP without sufficient means to combat the pandemic.[17] The extreme outbreak of COVID-19 and the BOP's inability to deal with it has drawn the attention of members of Congress. A November 9, 2020 letter to BOP Director Carvajal demanded answers to why the spread of COVID has gone unchecked at Fort Dix.[18]

The conditions at Fort Dix have led to deplorable conditions and treatment of inmates. Judge Schiller noted that the "BOP has severely limited the

---

[16]https://www.burlingtoncountytimes.com/story/news/2020/11/19/fci-fort-dix-officials-deny-covid-outbreak-began-inmate-transfers/6344172002/

[17] See *United States v. Rodriguez*, Crim A. NO. 03-271, 2020 WL 162331, at *1, 8-9 (E.D. Pa. Apr. 1, 2020)("Prisons are tinderboxes for infectious disease.").

[18] Letter from Robert Menendez, U.S. Senator, Cory A. Booker, U.S. Senator, Frank Pallone, Jr., Member of Congress, et al., to Mr. Michael Carvajal, Director, Federal Bureau of Prisons, November 9, 2020, attached hereto as Exhibit D.

movement of inmates and detainees and requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease."[19] Men are being warehoused, according to Mr. Basralian.[20] Inmates are restricted to three (3) hours of outdoor recreation per week; there was an outbreak of Legionnaires disease; and aside from GED courses there are no services being provided to the inmates, such as religious, medical, psychiatric, work, or vocational.[21] Mice are sleeping in inmates' shoes; on cold evenings inmates sleep in multiple layers of clothing which they then have to wear throughout the day; food is served in Styrofoam boxes and must be eaten in the bunk area since the dining facilities are closed; food debris in the bunk areas is bringing in rodents and insects; and urinals are not working and are backed up and in need of repair for weeks.[22] "'It is filthy, people are ill, everyone is depressed, everyone looks like death,' one inmate said. 'They are not giving us any medicine or treatments, and we were told that they were just going to 'let this ride out, like they do on the street' by the staff here.'"[23]

As this Court is very much aware since sentencing Mr. Basralian more than a year ago, he suffers from a host of medical conditions which places him at high risk of becoming severely ill or dying from the virus. Pursuant to the Pre-Sentence Report, Mr. Basralian suffers from the high blood pressure and high cholesterol

---

[19] *U.S. v. Brown, supra.*
[20] See October 2, 2020 email from Mr. Basralian, attached hereto as Exhibit E.
[21] *Id.*
[22] See September 20, 2020 email from Mr. Basralian, attached hereto as Exhibit F.
[23] Kegan Hamilton, "Federal Prisons Keep Turning Into COVID Nightmares: 'Everyone Looks Like Death'", Vice.com, Nov. 12, 2020.

(diagnosed 1999); heart disease; angina, hypertension, pulmonary arterial hypertension, and major depressive disorder.[24] These ailments are also delineated in Mr. Basralian's medical records kept by the BOP.[25]

The top COVID-19 comorbidities listed in New York by the NY Times on April 16 include hypertension, diabetes, high cholesterol, and coronary artery disease – of which Mr. Basralian suffers from three.[26] Mr. Basralian's cardiologist, Dr. William Lyons, notes "Mr. Gary Basralian is at high risk of a grave outcome from a Covid-19 infection. As per the [Center for Disease Control guidelines], his risk of death is increased by his age (greater than 65) and coronary artery bypass surgery with 3 bypasses and aortic valve replacement in April, 2015. His cardiac condition will require life-long access to quality medical care, cardiac medication and cardiac testing."[27]

Studies have conclusively demonstrated that individuals with multiple comorbid conditions – such as Mr. Basralian – fare much worse than the average individual who may become infected. The CDC has specifically identified the population most at risk of death from the disease to include adults 65 years or older and anyone with chronic medical conditions, such as long disease, heart disease, and diabetes.[28]

---

[24] PSR §83-87.
[25] BOP medical records, attached hereto as Exhibit G.
[26] Danny Hakim, *Asthma is Absent Among Top COVID-19 Risk Factors, Early Data Shows,* NY Times (April 20, 2020) https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.
[27] Letter of Dr. William Lyons, dated April 21, 2020, attached hereto as Exhibit H.
[28] See. "People Who Are At Higher Risk," CDC (March 26, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

To further complicate issues, Mr. Basralian was scheduled to have an echocardiogram to monitor his heart condition. The Fort Dix staff promised him an examination with the camp cardiologist but that has not occurred in more than a year of incarceration.[29] Mr. Basralian has requested both in writing and verbally to see a cardiologist several times since February 27, 2020 but those requests have been ignored or denied.[30] He also visits the infirmary on a regular basis to have his blood pressure checked and is turned away.[31] Due to his infirmities, Mr. Basralian requires blood work, blood pressure checks, and examinations with a cardiologist.[32] To date, the cardiologist has not visited the facility nor have video conferences been held with patients.

It is important to note that Mr. Basralian is the oldest inmate in the Fort Dix camp, and just one of 3 remaining inmates who are older than 70, all of whom have medical conditions that leave them highly susceptible to severe consequences from contracting COVID-19.[33] This is through no fault of Mr. Basralian, as he has had no infractions with the BOP, has demonstrated that he has a safe and stable place to live if released, and has complied with all the required regulations to obtain his release. All the other elderly inmates have been released, either by the BOP or courts hearing compassionate release motions.

---

[29] See October 22, 2020 email by Gary Basralian, attached hereto as Exhibit I.
[30] *Id.* See also November 12, 2020 email, attached hereto as Exhibit J.
[31] See November 24, 2020 letter of Dr. Lyons, Cardiologist, attached hereto as Exhibit K.
[32] *Id.*
[33] See November 5, 2020 email by Gary Basralian, attached hereto as Exhibit L.

9

At Mr. Basralian's sentencing hearing, his medical conditions were brought to the attention of the court and are memorialized in his PSR. Mr. Basralian and his family were assured that proper medical care would be provided such that his sentence would not become a death sentence. In fashioning the Court's sentence, Your Honor considered Mr. Basralian's age and medical conditions by opining that a shorter sentence than requested by the Government would enable Mr. Basralian to return to the community and begin working to pay off the restitution.[34] To date, the BOP has failed to provide medical care to address Mr. Basralian's medical needs and it appears that there is no intention of doing so. Further, Mr. Basralian tested positive for COVID in May 2020 and luckily was asymptomatic. However, this test result has not been corroborated by an antibodies test or a second test, and so there is nothing to rule out a "false positive".,

Doctors studying the virus and its side effects have observed that COVID-19 can damage the heart by inflaming the tissues that surround the heart thus weakening the heart muscle – eventually leading to heart failure.[35] Due to Mr. Basralian's pre-existing heart condition, such a probability without proper medical treatment is a recipe for certain death. Moreover, a prior infection of COVID does not prevent him from being reinfected and subject to suffering severe

---

[34] See Transcript of Sentencing at 54, attached hereto as Exhibit M.

[35] *When COVID-19 Becomes a Chronic Illness*, economist.com, August 22, 2020, https://www.economist.com/science-and-technology/2020/08/22/when-covid-19-becomes-a-chronic-illness.

10

consequences.[36] According to the CDC it is not yet known whether survivors of COVID-19 will emerge with immune protection.[37]  The World Health Organization concurs in a statement cautioning against the use of "immunity passports":

> Some governments have suggested that the detection of antibodies to the SARS-CoV-2, the virus that causes COVID-19, could serve as the basis for an 'immunity passport' or 'risk-free certificate' that would enable individuals to travel or to return to work assuming that they are protected against re-infection. *There is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection.*[38] The evidence of an ongoing risk of reinfection extends beyond academic

research.  Thirteen of the USS Theodore Roosevelt sailors who had contracted the virus, survived, and recovered, have now tested positive a second time.[39] The CDC cautions that "[t]he immune response, including duration of immunity, to SARS-CoV-2 infection is not yet understood. Patients with MERS-CoV are unlikely to be re-infected shortly after they recover, but it is not yet known whether similar immune protection will be observed for patients with COVID-19."[40] This is particularly true for those who had only a mild version of the illness. In early testing, not all individuals infected with COVID-19 developed antibodies. In

---

[36] Sylar Jeremias, *First Case of COVID-19 Reinfection Detected in the U.S.*, The American Journal of Managed Care, October 12, 2020, https://www.ajmc.com/view/first-case-of-covid-19-reinfection-detected-in-the-us.

[37] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

[38] https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19. (emphasis added).

[39] https://www.npr.org/sections/coronavirus-live-updates/2020/05/16/857379338/5-uss-roosevelt-sailors-test-positive-for-covid-19-again.

[40] *Clinical Questions about COVID-19: Questions and Answers*, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

particular, mild cases of COVID-19 can resolve before significant and enduring levels of antibodies are found. [41]

It is unknown when this pandemic will subside. However, it is known that a vaccine is thankfully on the horizon.[42] There may be a temptation to delay compassionate release in hopes that Mr. Basralian will live until he can be vaccinated. It remains unclear whether the vaccines will be widely available before Spring, 2021, or when they will be provided to inmates in sufficient numbers to achieve herd immunity. To delay action at this point in the hope that something will dramatically change for the positive, despite all the objective evidence, is dangerous to Mr. Basralian. Since the evidence is that this pandemic is turning for the worse, delay could be fatal.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. Mr. Basralian's Criminal Conviction

On August 29, 2018, Mr. Basralian pled guilty to violations of 18 U.S.C. §1343 (wire fraud) and 15 U.S.C. §80b-6 and 80b-17 (investment advisor fraud).[43] On September 6, 2019, this Court sentenced Mr. Basralian to seventy months imprisonment. On November 18, 2019, Mr. Basralian self-surrendered to FCI Fort Dix where he remains to date.

---

[41] Robert D. Kirkcaldy, et al., *COVID-19 and Postinfection Immunity*, JAMA (May 11, 2020), https://jamanetwork.com/journals/jama/fullarticle/2766097.

[42] https://www.nytimes.com/live/2020/11/23/world/covid-19-coronavirus?type=styln-live-updates&label=virus&index=1&action=click&module=Spotlight&pgtype=Homepage

[43] See Judgment of Conviction, attached hereto as Exhibit N.

Mr. Basralian has served one year of his sentence. With the good conduct credit he receives for each year he serves, he would then be eligible for release after serving approximately 85% of the seventy months, or 59.5 months. Mr. Basralian has already served 12 months which reduces his remaining sentence to 47.5 months. Pursuant to the Cares Act, Mr. Basralian would be eligible for home confinement after he serves 50% of his sentence after good conduct credit is applied, which would be 29.75 months. Since he has already served 12 months of his sentence, he would be eligible for home confinement in 17.75 months, assuming all good time credits. Thus, if Mr. Basralian's application for compassionate relief were granted, it would merely allow him to be sentenced to time served with supervised release one and a half years earlier than he would be otherwise eligible. In other words, his supervised release would be increased by a mere one and a half years.

Mr. Basralian submitted requested compassionate release due to his age and medical conditions on March 28, 2020.[44] That application was denied by BOP on April 26, 2020.[45] On June 8, 2020, this Court denied defendant's appeal of that denial without prejudice.[46]

On June 20, 2020, Mr. Basralian re-filed his application for compassionate relief. On June 25, 2020, the BOP denied Mr. Basralian's application.[47] Having

---

[44] See March 28, 2020 F-8 form, attached hereto as Exhibit O.
[45] See April 26, 2020, BOP denial, attached hereto as Exhibit P. (Requested from BOP, still pending).
[46] See Order, dated June 8, 2020, attached hereto as Exhibit Q.
[47] See June 25, 2020, BOP denial, attached hereto as Exhibit R.

13

exhausted his administrative remedies, Mr. Basralian now appeals the denial of his petition for compassionate relief pursuant to 18 U.S.C. §3582(c)(1)(A).

**B.     Mr. Basralian's Underlying Medical Conditions Make Him Particularly Susceptible to COVID-19 Complications.**

Mr. Basralian is 73-year-old and suffers from several underlying medical conditions that make him "high-risk" for developing serious symptoms, hospitalization, and death should he contract COVID-19. As previously stated, Mr. Basralian suffers from high blood pressure and high cholesterol. These conditions resulted in surgery in February 2015 to implant stents to improve blood circulation. He also suffers from heart disease such that he underwent an aortic valve replacement and triple by-pass surgery in April 2015.

Mr. Basralian is not receiving the medical attention he needs to address his conditions. Mr. Basralian is required to take several medications, including, but not limited to, atorvastatin for cholesterol; metoprolol tartrate to regulate heart rate and treat angina, hypertension and heart disease; sildenafil citrate for pulmonary arterial hypertension; and Wellbutrin Sr. for major depressive disorder.

At FCI Fort Dix, Mr. Basralian does not have access to all his required medications. He was able to self-surrender with his filled prescription of Wellbutrin; however, the prison medical staff would not refill it. Instead, they offered an alternative medication, but they could not definitively advise if it would affect his heart condition or counteract with his other medication. The staff will

14

not provide him with sildenafil citrate. He still takes atorvastatin, but the dosage was increased by his private cardiologist from 40 to 80 mg daily. He is also taking metoprolol, 25 mg twice daily, as well as vitamin supplements and aspirin.[48]

Mr. Basralian must take 800 mg of Amoxicillin before dental treatments to protect his new heart valve from potential infection, but the medical staff refused to prescribe this for recent dental treatment. Mr. Basralian was forced to contact his cardiologist who then issued the prescription. Since then, BOP has not provided appropriate dental treatment. Mr. Basralian has twice requested to see a dentist due to a lost cap and the exposed root canal which causes substantial pain, but those requests have gone unanswered.[49]

Because Mr. Basralian has coronary artery disease and hypertension, all co-morbidities for COVID-19, and is unable to receive the necessary healthcare in Fort Dix, Mr. Basralian is in life-threatening danger by any objective measure should he contract COVID-19 a second time.

## LEGAL ARGUMENT

18 U.S.C. §3582(c)(1)(A), as amended by the First Step Act, allows a reduction of an inmate's term of imprisonment if the court finds that: (1) "extraordinary and compelling reasons" warrant such a reduction; (2) the reduction would be "consistent with applicable policy statements issued by the Sentencing Commission;" and (3) the applicable sentencing factors set forth under 18 U.S.C. §3553(a) are met. *See* 18 U.S.C. § 3582(c)(1)(A). "Accordingly, to

---

[48] See November 12, 2020 email from Gary Basralian, attached hereto as Exhibit S.
[49] *Id.*

obtain relief under section 3582(c)(1)(A)(i), [Mr. Basralian] must show that (1) he has met the exhaustion requirement or the requirement is otherwise excused, (2) 'extraordinary and compelling reasons' warrant a reduction of his sentence, (3) he is not a danger to others or the community, and (4) a reduction is consistent with the factors set forth in Section 3553(a)." *See United States v. Lucas*, No. 15-CR-143, 2020 WL 2059735, at *2 (W.D.N.Y. Apr. 29, 2020).

Recently, the Court of Appeals for the Second Circuit held that the authority of the district court to grant such a motion includes modification of the previously imposed sentence to suit the circumstances of the incarceration and the defendant, leaving to the discretion of the district court to determine the merit of such motions. See *United States v. Brooker*, No. 19-3218, 2020 WL 5739712 (2d Cir. Sept. 25, 2020) ("A district court could reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place").[50] "The amendment of the compassionate release statute by the FSA freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them when seeking a sentence reduction." *United States v. Fisher*, 83 Cr 150 (PAC)(S.D.N.Y., Oct. 9, 2020),*quoting Brooker*, at 7. (internal quotations omitted).

---

[50] In just 8 weeks, *Brooker* has been cited by another court more than 125 times when determining a motion for compassionate release. https://casetext.com/case/united-states-v-brooker-6/how-cited?utm_source=Iterable&utm_medium=email&utm_campaign=prospecting-emails&citingPage=1&sort=relevance.

16

Mr. Basralian satisfies each of these criteria, warranting a reduction in his sentence to time served and his immediate release to home confinement added as a special term of supervision.

1.    **MR. BASRALIAN HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES**

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons ("BOP"), Congress expanded the statute in the First Step Act of 2018. Pub. L. 115-391 §603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, 18 U.S.C. § 3582(c)(1)(A) now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

On June 20, 2020, Mr. Basralian filed a petition for compassionate relief, and that request was denied on June 25, 2020. Therefore, Mr. Basralian is deemed to have exhausted his administrative remedies, and this Court may now review the Motion to Reduce Sentence and for Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A).

2.    **MR. BASRALIAN MEETS THE "EXTRAORDINARY AND COMPELLING" REASON STANDARD TO WARRANT A REDUCTION OF HIS SENTENCE PURSUANT TO 18 U.S.C. SECTION 3582(c)(1)(A)(i).**

By enacting the First Step Act, "Congress has made the legislative judgment to increase the use of compassionate release." *United States v. Ebbers*,

432 F. Supp. 3d 421, 430 (S.D.N.Y. 2020). Congress "delegated to the United States Sentencing Commission the task of describing what should be considered extraordinary and compelling reasons for sentence reduction." *Lucas*, 2020 WL 2059735, at *3 (alterations and quotation marks omitted) (citing 28 U.S.C. §994(t)). In turn, the United States Sentencing Commission (the "Commission") promulgated Sentencing Guideline § 1B1.13. The Guideline provides examples of "extraordinary and compelling reasons" only in its application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness; (2) debilitating physical or mental health condition; (3) advanced age and deteriorating health in combination with the amount of time served; or, (4) compelling family circumstances.  U.S.S.G. § 1B1.13 *cmt.* 1(A)–(C).

However, the Second Circuit's recent decision in *Brooker, supra*, overrules the idea that the Bureau of Prisons must first determine whether some unenumerated circumstance qualifies as an extraordinary and compelling reason for a sentence reduction. As the court held in *Brooker*, this policy statement predates the passage of the First Step Act, Pub. L. No. 115-39L, 132 Stat. 5194 (2018) which modified the compassionate release provision by "free[ing] the district courts to exercise their discretion in determining what are extraordinary circumstances." *Brooker*, 2020 WL 5739712, at 5. Indeed, the Court may make an independent assessment of the reasons for release, though U.S.S.G. Section 1B1.13 may still be informative to a court. *See United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019) ("[I]f the [First Step Act] is to increase the use

of compassionate release, the most natural reading of the amended §3582l and §994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive.") (internal quotation marks and citations omitted); *see also United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under §3582l(1)(A)(i)").

Here, Mr. Basralian's advanced age, underlying medical conditions, and unique susceptibility to contracting COVID-19 a second time, especially while housed in a crowded facility with limited ability to take necessary self-protective measures such as the ability to practice social distancing and wear personal protective equipment ("PPE"), support a clear finding of "extraordinary and compelling reasons" warranting Mr. Basralian's immediate release.

Moreover, several courts have concluded that the COVID pandemic in and of itself is an "extraordinary and compelling reason."[51] While it might seem that release of the defendant is not necessary at this point because the pandemic will eventually subside, this is not correct. The pandemic, aside from posing a direct

---

[51] See *United States v. Avery*, 14-CR-810 (JMF)(SDNY, 11/16/20); *United States v. Naik*, 18-CR-190-WJM(DNJ, 10/21/20); *United States v. Mongelli*, 02-CR-307 (NGG)(E.D.N.Y. Nov. 3, 2020; *United States v. Brown*, CR 13-176-1, (E.D. Pa. Sept. 29, 2020); *United States v. McNish*, CR 10-524 (E.D. Pa. Sept. 22, 2020

threat to Mr. Basralian's health, has made Mr. Basralian's incarceration harsher and more punitive than it would otherwise have been. Federal prisons, as prime candidates for the spread of the virus, (see *United States v. Al-Kassar*, 2020 *WL* 4813199, at 1 (S.D.N.Y., Aug 19, 2020)), have imposed onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal. For someone with Mr. Basralian's health profile, the risks of suffering severe health consequences if he submits to COVID-19, coupled with the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure Mr. Basralian's safety, mean that "the actual severity of his sentence as a result of the COVID-19 outbreak exceeds what the court anticipated at the time of sentencing." *United States v. Mel*, No. TDC-18-0571, 2020 *WL* 2041674, at 3 (D. MD., Apr. 28, 2020). This second factor also weighs heavily in favor of a finding of extraordinary and compelling circumstances.

## A. The Devastating Impact of COVID-19 and the Ensuing Public Health Crisis

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus, which causes COVID-19, as a pandemic. The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease. All 50 states and the national government have declared states of emergency. *See Proclamation on Declaring a National Emergency Concerning the Novel*

*Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020).[52]   COVID-19 has infected over 6,600,000 people across the United States, leading to at least 196,000 deaths.[53] As of September 17, 2020, COVID-19 resulted in 16,054 deaths in New Jersey—the second highest number of deaths in the nation. COVID-19 continues to spread rapidly with no end in sight. Indeed, the Director of the Centers for Disease and Control ("CDC") recently warned that the United States may be in for the "worst fall" ever seen from a public health perspective.[54] COVID-19 is far from contained.  As observed around the world, new cases can spike and there can be a resurgence of rapidly spreading infections at any time, which is expected to continue until a vaccine is widely available.  In New Jersey, the average of new daily cases has been increasing over the past several weeks.[55] COVID-19, and the dangers associated with contracting the virus, will continue to persist for the foreseeable future.

### B.   Mr. Basralian is at a Higher Risk of Suffering Severe Complications from Contracting COVID-19 While Incarcerated

Unsurprisingly, incarcerated individuals are at a higher risk, as compared to the general population, of being exposed to and contracting COVID-19. The CDC

---

[52]https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/_(last accessed Sept. 17, 2020).

[53] Tracking The Pandemic: Are Coronavirus Cases Rising Or Falling In Your State? NPR (September 17, 2020)      https://www.npr.org/sections/health-shots/2020/03/16/816707182/map-tracking-the-spread-of-the-coronavirus-in-the-u-s (updating regularly).

[54] Coronavirus in Context: CDC Director Discusses Next Step in War Against COVID, https://www.webmd.com/coronavirus-in-context/video/robert-redfield (last accessed September 17, 2020).

[55] Coronavirus Maps: How Severe Is Your State's Outbreak? https://www.npr.org/sections/health-shots/2020/09/01/816707182/map-tracking-the-spread-of-the-coronavirus-in-the-u-s (last accessed September 20, 2020).

issued *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), which recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities. [56] It states:

Many opportunities exist for [COVID-19] to be introduced into a correctional or detention facility, including daily staff movements; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to [COVID-19] in the surrounding community or other regions.

Per public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[57] As a result of widespread concern regarding the spread of COVID-19 in prisons, the New Jersey Supreme Court issued an unprecedented order requiring the immediate release of several categories of inmates, estimated to affect up to 1,000 inmates.[58] *See* Consent Order, *In the Matter of the Request to*

---

[56]https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. (last accessed Sept. 17, 2020).

[57] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (last accessed September 17, 2020).

[58] *N.J. releasing some non-violent inmates from jail this week to fight coronavirus outbreaks*

*Commute or Suspend Certain County Jail Sentences*, Supreme Court of New Jersey (Mar. 23, 2020). The Attorney General's Office has similarly recognized that "for some lower-level, non-violent offenders, it may be safer to temporarily release these individuals to their homes than to keep them detained in a county jail."[59] Courts in this district, across this circuit, and around the country have released many inmates because of the COVID-19 pandemic.[60]

---

*behind bars,* https://www.nj.com/coronavirus/2020/03/nj-will-start-releasing-some-non-violent-inmates-from-jail-this-week-in-effort-to-stop-outbreak-behind-bars.html (last accessed September 17, 2020).

[59] N.J. May Release Some Jail Inmates as Coronavirus Spreads Behind Bars, The Star Ledger, Mar. 20, 2020, available at https://www.nj.com/politics/2020/03/nj-may-release-some-jail-inmates-as-coronavirus-spreads-behind-bars.html (last accessed September 17, 2020).

[60] *See United States v. Paz*, No. CR 92-172 (D.N.J. July 10, 2020); *United States v. McCalla*, No. CR 11-452 (D.N.J. July 2, 2020) (Fort Dix); *United States v. Roeder*, No. 20-1682, 807 Fed.Appx. 157, 159-60 (3d Cir. Apr. 1, 2020) (reversing District Court's denial of delayed self-surrender to FCI Allenwood); *United States v. Larry Butler*, No. CR 10-612 (E.D. Pa. Sept. 8, 2020); *United States v. Davidson*, No. 2:16-CR-00139-2 (W.D. Pa. Aug. 20, 2020); *United States v. Gustafson*, No. 2:15-CR-00073-1 (W.D. Pa. Aug. 20, 2020); *United States v. Smith*, No. CR 9-187 (W.D. Pa. July 20, 2020); *United States v. Poole*, No. 2:02-CR-20026 (W.D. Tenn. July 14, 2020); *US v. Hakeem Gentry*, 19-78 (CCC); *US v. John Bennett*, 09-656 (SDW); *US v. Hyshawn Butler*, 16-080 (CCC) (filed pre-COVID; granted post-COVID); *US v. Brent Pettit*, 03-845 (AET); *United States v. Malcolm Ladson*, Crim. No. 04-697, DE ## 263, 264 (E.D. Pa., June 22, 2020) (FCI Allenwood); *United States v. Stephen Jemal*, Crim. No. 15-570, DE # 93 (E.D. Pa. Apr. 8, 2020) (FCI Otisville) (2 inmates and 3 staff members positive, BOP released to home confinement so compassionate release motion dismissed); *United States v. Tyrone Bazzle*, Crim. No. 11-74, DE # 84 (E.D.Pa. May 5, 2020) (FMC Devens); *United States v. Monica Harrison*, 14-349, DE # 212 (E.D.Pa. May 26, 2020) (FCI Danbury); *United States v. Shaheen Muhammed*, 18-387, DE # 76 (E.D.Pa. May 23, 2020) (FCI Schuylkill); *United States v. Antoine Murphy*, Crim. No. 04-555, DE # 51 (E.D.Pa. June 12, 2020) (FMC Devens); *United States v. Thomas Olmedo*, Crim. No. 01-449, DE # 79 (E.D.Pa. June 18, 2020) (FCI Danbury) (positive for COVID); *United States v. Jeremy Rodriguez*, Crim. No. 03-271, DE ## 135, 136 (E.D.Pa. Apr. 1, 2020) (FCI Elkton); *United States v. Willie Sawyer*, Crim. No. 99-35, DE # 216 (E.D.Pa. May 26, 2020) (FMC Rochester); *United States v. Daniel Starczewski*, Crim. No. 14-133, DE # 353 (E.D.Pa. May 8, 2020) (FCI Butner Low); *United States v. Saeed Washington*, Crim. No. 04-411, DE # 189 (E.D.Pa. June 5, 2020) (FMC Devens); *United States v. Michael Pabon*, Crim. No. 17-165, DE ## 118, 119 (E.D.Pa. May 4, 2020) (Lewisburg Camp); *United States v. Cynthia Brown*, Crim. No. 13-176, DE ## 375, 376 (E.D.Pa. May 22, 2020) (FPC Alderson); *United States v. Terrance Murphy*, Crim. No. 18-146, E # 69 (W.D.Pa. July 1, 2020) (FMC Devens); *United States v. Antonuan Smith*, Crim. No. 15-44, DE # 125 (W.D.Pa. June 25, 2020 (FCI Fort Dix); *United States v. Tamika Somerville*, Crim. No. 12-225, DE ## 93, 95 (W.D.Pa. May 29, 2020) (FCI Danbury); *United States v. Larry Winckler*, Crim. No. 13-318 (W.D. Pa. Apr. 3, 2020); *United States v. Anthony McCullough*, Crim. No. 15-160, DE # 204 (W.D.Pa. Aug. 8, 2019) (FMC Butner); *United States v. Joseph Ollie*, Crim. No. 12-09, DE ## 154-156 (W.D.Pa. June 24, 2020) (FCI Elkton); *United States v. Nathan Hampton*, Crim. No. 17-289, DE # 446 (W.D.Pa. May 6, 2020) (Northeast Ohio Correctional Center awaiting BOP designation); *United States v.*

There can be no debate that these are extraordinary times in federal prisons across the country. As of November 12, 2020, there were 2,894 federal inmates and 997 BOP staff who currently have COVID-19.[61] Additionally, 17,107 inmates and 1592 staff were diagnosed with, and have since recovered from, COVID-19. Sadly, there have been 137 federal inmate deaths and two BOP staff member deaths attributed to COVID-19.[62] More relevant to Mr. Basralian, the numbers at Fort Dix are soaring such that the facility has the most COVID positive inmates in the BOP nationwide.[63] It is likely that more positive cases would be identified in the facility if widespread testing were conducted. *See United States v. Pabon*, 2:17-cr-00165-AB-1, 2020 WL 2112265, at *4 and n. 19 (E.D. Pa.. May 4, 2020) (Court ordered compassionate release and noted that "[a]lthough the government represents that Lewisburg Camp has no cases of COVID-19, the government never says whether anyone has been tested," and further noting that an article dated April 29, 2020, stated that only 2,700 of approximately 150,000 federal inmates have been tested and, of those tested, 70% were positive.).

The Court in *Pabon* noted that when Montgomery County, Pennsylvania tested every inmate in custody, it discovered a rate of infection of 30 times greater than what the county had detected before it started mass testing. *Id.* Additionally, when a prison in North Carolina tested all its inmates, it discovered it had 444

---

*Timothy Foster*, Crim. No. 14-324, DE # 191 (M.D.Pa. Apr. 3, 2020) (FCI Sheridan); *United States v. Heffington*, No. 1:93-CR-05021-NONE (E.D. Cal. Aug. 4, 2020); *United States v. Rodriguez*, No. 3:17-CR-4477-BTM (S.D. Cal. Aug. 5, 2020); *United States v. Luna*, No. 90-CR-00392-PJH-1 (N.D. Cal. Aug. 13, 2020); and *United States v. Vega*, No. 1:16-CR-00319 (N.D. Ohio Aug. 18, 2020).

[62] *Id.*
[63] *Id.*

cases rather than the 39 cases it had previously thought. *Id.* The Court stated, "[b]ecause the BOP has tested so few inmates, these statistics [overall BOP positive cases] almost certainly underestimate the true number of infections and the number of affected BOP facilities." *Id.* at *5. Indeed, unless accompanied by comprehensive testing data, bald statements surrounding the number of new positive tests are meaningless.

Until a vaccine is developed, the only way to effectively protect one's self is to abide by the recommended safety guidelines, such as maintaining social distancing and using PPE. It has become readily apparent, however, that it is impossible for Mr. Basralian to do so at FCI Fort Dix. Mr. Basralian shares a cramped undivided space and bathroom facilities with upwards of eighty-five other inmates, making social distancing impossible. *See United States v. McCalla*, No. CR 11-452 (FLW), 2020 WL 3604120, at *3 (D.N.J. July 2, 2020) (granting compassionate release and finding that the defendant was "unable to practice effective social distancing at Fort Dix"). Mr. Basralian does not have access to any PPE. *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *3 (D. Idaho Apr. 7, 2020) ("[T]he prison environment prevents [defendant] from being able to effectively self-isolate in the ways the CDC recommends for a person of his age and diminished health."). The BOP's modified procedures nonetheless present undue risks to inmates like Mr. Basralian. The inmates at FCI Fort Dix spend the majority of the day inside the dormitory space shared with upwards of

85 other people in a space with no barriers and no PPE and little to no outside recreation time.

While incarcerated, Mr. Basralian is at an undeniably greater risk of contracting COVID-19, which, due to his many co-morbidities, would likely result in a death sentence. Mr. Basralian's death in custody is in stark contrast to the sentence of this Court.

**C.    Mr. Basralian's Advanced Age and Underlying Medical Conditions Make Him "High-Risk" to Developing Serious Symptoms, Hospitalization, and Death as a Result of Contracting COVID-19**

Mr. Basralian is 73 years old and has a long history of medical issues that arose prior to his incarceration. The Mayo Clinic has stated that individuals with diabetes, high blood pressure, and heart disease are more likely to experience dangerous symptoms if infected with COVID-19.[64] Indeed, the CDC issued a report stating that nearly 90% of those hospitalized with COVID-19 had underlying conditions, including 49.7% of patients with high blood pressure, 28.3% with diabetes, and 27.8% with cardiovascular disease.[65] The Mayo Clinic also stated that, "[i]n the U.S., about 80% of deaths from the disease have been in people age 65 and older. Risks are even higher for older people when they have underlying health conditions."[66]

---

[64] *COVID-19: Who's at Higher Risk*, Mayo Clinic https://www.mayoclinic.org/diseases-conditions/coronavirus/in-`

[65] Karina Zaites & Ramon Padilla, *Coronavirus, diabetes, obesity and other underlying conditions: Which patients are most at risk?* USA Today (April 15, 2020) https://www.usatoday.com/in-depth/news/2020/04/15/coronavirus-risk-90-patients-had-underlying-conditions/2962721001/ (last accessed September 17, 2020).

[66] *COVID-19: Who's at Higher Risk*, Mayo Clinic https://www.mayoclinic.org/diseases-

Additionally, with the annual flu season about to start, Mr. Basralian is at an even higher risk of dying in prison. It is likely that COVID-19 and the flu could infect a patient at the same time or sequentially. It may be difficult for prison medical staff to appropriately distinguish between symptoms of COVID-19 and the flu, treat inmates rapidly enough, and contain the spread of both viruses, which will undoubtedly be a strain on already limited resources. Both viruses can cause dangerous inflammation in the lungs that can fill the airspaces with fluid, making it difficult to breathe. With both viruses at the same time, the severity of respiratory failure is greater.[67] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons addressed a high number of cases.[68] Accordingly, the life-threatening danger that exists by keeping Mr. Basralian in prison during the flu season over the next couple months, while he is particularly susceptible to dying from COVID-19, is a compelling reason for immediately release.

Given Mr. Basralian's undeniable susceptibility to developing serious symptoms and dying from COVID-19, the "extraordinary and compelling reasons" standard is met, warranting his compassionate release to home confinement at this time. Courts across this circuit and around the country have already granted compassionate release to inmates suffering from the same medical conditions

conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301 (last accessed September 17, 2020) (emphasis added).

[67] *Flu Season Looms And Scientists Wonder How Flu And COVID-19 Might Mix* (Sept. 3, 2020) https://www.npr.org/sections/health-shots/2020/09/03/909000378/flu-season-looms-and-scientists-wonder-how-flu-and-covid-19-might-mix (last accessed September 18, 2020).

[68] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY (last accessed July 7, 2020).

that Mr. Basralian suffers. The National Association of Criminal Defense Lawyers ("NACDL") Compassionate Release Clearinghouse COVID-19 project assembled cases in which defendants with diabetes and/or hypertension/high blood pressure were granted compassionate release. Since March 27, 2020, there were over one hundred such cases.[69]

---

[69] The following string cite reflects matters in which defendants were granted compassionate release, all of whom had high blood pressure and/or diabetes in the month of May alone. *See United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Mattingly*, 6:15-cr-00005-NKM-JCH, 2020 WL 2499707 (W.D. Va. May 14, 2020); *United States v. Lopez*, 1:18-cr-02846-MV-1, 2020 WL 2489746 (D. N.M. May 14, 2020); *United States v. Gutman*, 1:19-cr-00069-RDB-2, 2020 WL 2467435 (D. Md. May 13, 2020); *United States v. Sedge*, 1:16-cr-00537-KAM, 2020 WL 2475071 (E.D. N.Y. May 13, 2020); *United States v. Barber*, 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Rivernider*, 3:10-cr-00222- RNC, 2020 WL 2393959 (D. Conn. May 12, 2020); *United States v. Ramirez*, 1:17-cr-10328-WGY, 2020 WL 2402858 (D. Mass. May 12, 2020); *United States v. Ullings*, 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Valencia*, 1:15-cr-00163-AT-1, 2020 WL 2319323 (S.D. N.Y. May 11, 2020); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Reddy*, 2:13-cr-20358-MFL-LJM-1, 2020 WL 2320093 (E.D. Mich. May 11, 2020); *United States v. Pena*, 1:15-cr-00551-AJN-1, 2020 WL 2301199 (S.D. N.Y. May 8, 2020); *United States v. Connell*, 18-cr-00281-RS-1, 2020 WL 2315858 (N.D. Cal. May 8, 2020); *United States v. Vo*, 15-CR-00310-BLF-2, 2020 WL 2300101 (N.D. Cal. May 7, 2020); *United States v. Quintero*, 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Reid*, 3:17-cr-001750-CRB-2, 2020 WL 00001-AA, 2020 WL 2096423 (D. Or. May 1, 2020); *United States v. Lacy*, 3:15-cr-30038-SEM-TSH1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Rivera*, 1:86-cr-01124-JFK-4, 2020 WL 2094094 (S.D. N.Y. May 1, 2020); *United States v. Reid*, 17-cr-000175, CRB-2, 2020 WL 2128855 (N.D. Cal. May 5, 2020); *United States v. Pabon*, 2:17-cr-00165-AB-1, 2020 WL 2112265 (E.D. Penn. May 4, 2020); *United States v. Guzman Soto*, 1:18-cr-10086-IT-1, 2020 WL 2104787 (D. Mass. May 1, 2020). *United States v. Doshi*, No. 2:13-cr-20349-AJT-LJM-1, 2020 WL 2556794 (E.D. Mich. May 20, 2020); *United States v. Agomuoh*, No. 5:16-cr-20196-JEL-RSW-1, 2020 WL 2526113 (E.D. Mich. May 18, 2020); *United States v. Cotinola*, No. 1:13-cr-03890-MV-1, 2020 WL 2526717 (D. N.M. May 18, 2020); *United States v. Sholler*, No. 17-CR-00181-SI-1, 2020 WL 2512416 (N.D. Cal. May 15, 2020); *United States v. Pomante*, No. 19-20316, 2020 WL 2513095 (E.D. Mich. May 15, 2020); *United States v. Ennis*, No. 3:02-cr-01430-PRM-1, 2020 WL 2513109 (W.D. Tex. May 14, 2020); *United States v. Mattingley*, No. 6:15-cr-00005-NKM-JCH, 2020 WL 2499707 (W.D. Va. May 14, 2020); *United States v. Lopez*, No. 1:18-cr-02846-MV-1, 2020 WL 2489746 (D. N.M. May 14, 2020); *United States v. Barber*, No. 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Rivernider*, No. 3:10-cr-00222-RNC, 2020 WL 2393959 (D. Conn. May 12, 2020); *United States v. Hunt*, No. 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ramirez*, No. 1:17-cr-10328-WGY, 2020 WL 2402858 (D. Mass. May 12, 2020); *United States v. Al-Jumail*, No. 2:12-cr-20272-DPH-LJM-3, 2020 WL 2395224 (E.D. Mich. May 12, 2020); *United States v. Simpson*, No. 3:11-cr-00832-SI-3, 2020 WL 2323055 (N.D. Cal. May 11, 2020); *United States v. Reddy*, No. 2:13-cr-20358-MFL-LJM-1, 2020 WL 2320093 (E.D. Mich. May 11, 2020); *United States v. Amarrah*, No. 5:17-cr-20464-JEL-EAS-1, 2020 WL 2220008 (E.D. Mich. May 7, 2020);

In sum, Mr. Basralian's coronary artery disease, hypertension, and other pre-existing medical conditions and age, coupled with the COVID-19 public health crisis and the pending flu season, constitute extraordinary and compelling reasons to order his immediate release under 18 U.S.C. Section 3582(c)(1)(A)(i).

### 3. MR. BASRALIAN IS NOT A DANGER TO THE COMMUNITY AND HIS COMPASSIONATE RELEASE IS CONSISTENT WITH THE FACTORS SET FORTH IN SECTION 3553(a)

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. §3582(c)(1)(A). Here, Mr. Basralian's advanced age, compromised physical health, and the unique danger he faces of contracting COVID-19 for a second time and becoming severely ill, when combined with the other Section 3553(a) sentencing factors, clearly warrant the requested relief.

The nature of Mr. Basralian's offense was non-violent and he is not a danger to the community, nor is his continued incarceration necessary to protect the community from his crimes. Mr. Basralian is a 73 year old with serious medical conditions and no history of violence. This Court did not previously believe that Mr. Basralian was a danger to the community as it allowed

United States v. Quintero, No. 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); United States v. Howard, No. 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020); United States v. Pabon, No. 2:17-cr-00165-AB-1, 2020 WL 2112265 (E.D. Penn. May 4, 2020); United States v. Lacy, No. 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); United States v. Ardila, No. 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); United States v. Saad, No. 16-20197, 2020 WL 2251808 (E.D. Mich. May 5, 2020).

Mr. Basralian to remain at large in the community from the date of his plea in August 2018 to the date he self-surrendered in November 2019.

Finally, under the circumstances, the time served is sufficient to balance the seriousness of his crime with the need to promote deterrence and respect for the law. Mr. Basralian has already served approximately 12 months of his seventy-month prison sentence. Courts around the country have released inmates who have served an even shorter percentage of their sentence. Since March 30, 2020, there have been at least forty such cases.[70] Requiring Mr. Basralian to serve any

---

[70] *See, e.g., United States v. Shehee*, 2020 WL 5229030, at *3 (E.D. Wash. Sept. 1, 2020) (defendant served 7.8%, 9 months of a 70 month sentence); *United States v. Prasad*, 2020 WL 2850147, at *1 (E.D. La. June 2, 2020) (defendant served *8%*, 2 months of a 24 month sentence); *United States v. Locke*, 2020 WL 3101016, at *1 (W.D. Wash. June 11, 2020) (defendant served *10%*, 6 months of a 62 month sentence); *United States v. Gonzalez*, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020) (defendant served *10%*, 1 months of a 10 month sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125, at *2, *6 (D. Haw. Apr. 13, 2020) (defendant served *13%*, 8 months of a 60 month sentence); *United States v. Barber*, 2020 WL 2404679, at *1 (D. Or. May 12, 2020) (defendant served *14%*, 8.5 months of a 60 month sentence); *United States v. Foreman*, 2020 WL 2315908, at *1 (D. Conn. May 11, 2020) (defendant served *17%*, 2 months of a 12 month sentence); *United States v. Pena*, 2020 WL 2798259, at *1, *6 (D. Mass. May 29, 2020) (defendant served *18%*, 6 months of a 32 month sentence); *United States v. Echevarria*, 2020 WL 2113604, at *1 (D. Conn. May 4, 2020) (defendant served *19%*, 9 months of a 48 month sentence); *United States v. Delateur*, 2020 WL 3989174, at *1 (W.D. Wash. July 1, 2020) (defendant served *19%*, 9 months of a 48 month sentence); *United States v. Brown*, No. 2:18-cr-360, ECF. No. 32 at *2 (N.D. Ala. May 21, 2020) (defendant served 20%, 12 months of a 60 month sentence); *United States v. Gorai*, 2020 WL 1975372, at *1 (D. Nev. Apr. 24, 2020) (defendant served **21%,** 12 months of a 57 month sentence); *United States v. Torres*, 2020 WL 4019038, at *1, *4 (S.D. Fla., July 14, 2020) (defendant served 21%, 5 months of a 24 month sentence); *United States v. Rahim*, 2020 WL 2604857, at *1 (E.D. Mich. May 21, 2020) (defendant served **22%,** 16 months of a 72 month sentence); *United States v. Atkinson*, 2020 WL 1904585, at *1 (D. Nev. Apr. 17, 2020) (defendant served 22%, 6 months of a 27 month sentence); *United States v. Delgado*, 2020 WL 2464685, at *2 (D. Conn. Apr. 30, 2020) (defendant served 24%, 29 months of a 120 month sentence); *United States v. Atwi*, 2020 WL 1910152, at *1, *5 (E.D. Mich. Apr. 20, 2020) (defendant served **25%,** 1 months of a 4 month sentence); *United States v. Young*, 2020 WL 2614745, at *4 (W.D. Wash. May 22, 2020) (defendant served 25%, 15 months of a 60 month sentence); *United States v. Common*, 2020 WL 3412233, at *1 (C.D. Ill. June 22, 2020) (defendant served **28%,** 33 months of a 120 month sentence); *United States v. Bayuo*, 2020 WL 3415226 (S.D.N.Y. June 20, 2020) (defendant served **28%,** 10 months of a 36 month sentence); *United States v. Jackson*, 2020 WL 3396901, at *2 (N.D. Ind. June 19, 2020) (defendant served **28%,** 24 months of an 87 month sentence); *United States v. Watson*, 3:18-cr-25 (D. NV. July 22, 2020) (Child Pornography defendant served **29%** or 14 of a 48 month sentence); *United States v. Gileno*, 2020 WL 1916773, at *1 (D. Conn. Apr. 20, 2020) (defendant served 29%,

more time, in light of the circumstances, will serve no purpose other than to unnecessarily put Mr. Basralian's life at risk, and potentially convert his seventy month prison sentence into a *de facto* death sentence.

In this case, a reduction of Mr. Basralian's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Mr. Basralian, whose ability to engage in basic self-protective measures is restricted—warrant judicial relief at this time. Mr. Basralian has been incarcerated for approximately twelve months which is "sufficient, but not greater than necessary" to satisfy the goals of sentencing under section 3553(a). Mr. Basralian seeks an order reducing his sentence to time served with home confinement as a condition of supervised release.

## 4.    MR. BASRALIAN HAS A SUPPORTIVE FAMILY AND TRANSITION PLAN

---

3.5 months of a 12 month sentence); *Loyd v. United States*, 2020 WL 2572275, at *1 (E.D. Mich. May 21, 2020) (defendant served **29%**, 35 months of a 120 month sentence); *United States v. Pabon*, 2020 WL 2112265, at *1 (E.D. Pa. May 4, 2020) (defendant served 30%, 14 months of a 46 month sentence); *United States v. Rodriguez-Acedo*, No. 19-cr-3539, Dkt. No. 44 (S.D. Cal. July 21, 2020) (defendant served **30%**, 11 months of a 37 month sentence); *United States v. Grubbs*, 2020 WL 3839619, at *1 (W.D. Wash. July 8, 2020) (defendant served 31%, 33 months of a 108 month sentence); *United States v. Winston*, No. 1:13-cr-639-RDB, ECF. No. 295 at* 2, 7 (D. Md. Apr. 28, 2020) (defendant served 30%, 36 months of a 120 month sentence); *United States v. Hunt*, 2020 WL 2395222, at *1 (E.D. Mich. May 12, 2020) (defendant served 30%, 9 months of a 30 month sentence); *United States v. Padilla*, 2020 WL 3100046, at *1 (S.D. Cal. June 11, 2020) (defendant served 33%, 10 months of a 30 month sentence); *United States v. Casey*, 2020 WL 2297184, at *1 (E.D. Va. May 6, 2020) (defendant served 33%, 15 months of a 45 month sentence); *United States v. Kamaka*, 2020 WL 2820139, at *1 (D. Haw. May 29, 2020) (defendant served **33%**, 4 months 12 of a month sentence); *United States v. Madrigal*, 2020 WL 3188268, at *1 (N.D. Cal. June 15, 2020) (defendant served 33%, 4 months of a 12 month sentence).

If released to home confinement, Mr. Basralian initially will reside at his family's home located at 3208 Seacrest Drive, Lavallette, NJ 08735, to quarantine for two weeks. His family has arranged for a doctor and nurse practioner to monitor Mr. Basralian's health. vis-à-vis temperature and symptoms of COVID-19. Following a 14-day self-imposed quarantine, Mr. Basralian will relocate to live with his wife in an apartment located at 71A Forest Drive, Springfield, NJ 07081. Mr. and Mrs. Basralian will be the home's only occupants. Mr. Basralian respectfully requests that this court permit him to quarantine at home under these circumstances.

Mr. Basralian's family is ready, willing, and able to support him in any and all ways necessary during his home confinement. During his incarceration, his family has been communicating with him almost daily via letters, e-mails, and phone calls. If visitation were available, they would be visiting him as frequently as permitted. The family will be providing financial support and has expressed willingness to pay for any medical needs that arise. His family will also drive him anywhere he needs to go to satisfy the conditions of his home confinement and supervised release, including to meetings with his probation officer, as well as doctor's visits.

With the support of his family and friends, Mr. Basralian will have all that he needs to adjust to his release from incarceration to home confinement. Importantly, his home environment presents the best opportunity for his health

and well-being, particularly during the pandemic, with no circumstances that would lead him to re-offend.

To the extent there is a shortage of monitoring equipment, we would request that it not delay his release. Mr. Basralian was not on monitoring equipment following his guilty plea until self-surrender, and there were no incidents with his pre-trial supervision. Should a shortage of monitoring equipment exist, he should be released to home confinement without monitoring equipment until such equipment becomes available.

### CONCLUSION

Mr. Basralian is a 73-year-old man with a multitude of co-morbidities that dramatically increase the risk of serious complications and death from the COVID-19 pandemic. He was sentenced to seventy months in prison for a non-violent crime. Clearly, the Court in this case did not anticipate or intend to impose a death sentence on him. Yet, that is the stark reality that Mr. Basralian faces if he is not released to home confinement as expeditiously as possible. Based on the foregoing, it is respectfully requested that the Court grant compassionate release in this matter.

Respectfully submitted,

REM KATCHER LAW GROUP, P.C.

Tamra Katcher (cm)

Tamra Katcher, Esq.
NJ Attorney ID #019251999
tkatcher@remlawgroup.com

Enclosures
cc:     Courtney A. Howard, AUSA (via email and ECF)
        Gary Basralian

33