# EXHIBIT H

 **ENGLEWOOD HEALTH** PHYSICIAN NETWORK | Cardiovascular Consultants of North Jersey

777 Terrace Avenue, Suite 311
Hasbrouck Heights, NJ 07604-3110

Tel: 201-288-4252
Fax: 201-288-7172

englewoodhealthphysicians.org

**CARDIOVASCULAR**

Evan D. Sehgal, MD,
F.A.C.C.
Diplomate, American Boards
of Internal Medicine &
Cardiology

William J. Lyons, MD,
F.A.C.C.
Diplomate, American Boards
of Internal Medicine &
Cardiology

Lane J. Benoff, MD
Diplomate, American Boards
of Internal Medicine &
Cardiology

Ramin S. Hastings, MD
Diplomate, American Boards
of Internal Medicine,
Cardiology & Interventional
Cardiology

April 21, 2020

To Whom It May Concern:

Mr. Gary Basralian is at high risk of a grave outcome from a Covid-19 infection. As per the CDC, his risk of death is increased by his age (greater that 65) and coronary artery bypass surgery with 3 bypasses and aortic valve replacement in April 2015. His cardiac condition will require life-long access to quality medical care, cardiac medication and cardiac testing.

Mr. Basralian is an appropriate candidate for home confinement as he is in a low-minimum risk security facility. He is deemed non-violent in terms of his behavior in and out of prison. Home confinement will help mitigate his risk of infection and death. It would also help by reducing overcrowding, improve his access to soap, hand washing and social distancing.

Covid-19 infection in prison is a multi-state issue including New Jersey. Preventing suffering and unnecessary death for prison staff and prisoners while protecting the public are the goals of Federal memos and programs for the last 2 months. Please consider his release.

Sincerely,

William J. Lyons, MD

WJL/er

# EXHIBIT I

# Tamra Katcher

| | |
|---|---|
| **From:** | BASRALIAN GARY (71610050) |
| **Sent Date:** | Thursday, October 22, 2020 12:06 PM |
| **To:** | tkatcher@remlawgroup.com |
| **Subject:** | misc. |



I have asked and submitted requests to see the cardiologist since February. I'm not submitting any more; they'll consider it harassament. I verbally questioned the nurse and was told that they're now "considering" and "investigating" the use of Zoom appointments; indicated reason is that the cardiologist doesn't want to come here.

cc: T. Katcher
   K. Topjian
   Dix file

# EXHIBIT J

# Tamra Katcher

**From:**       BASRALIAN GARY (71610050)

**Sent Date:**  Thursday, November 12, 2020 8:10 PM

**To:**         tkatcher@remlawgroup.com

**Subject:**    RE: medications

Also take Omeprazole 40 mg for chronic gastritis, GERD

re: Cardiologist: I started asking for an appt on February 27.
Asked several times; had put forms in but don't have copies.
requested verbally several more times.

May 3rd is when they increased my Atorvastatin to 80mg based on my MD's suggestion. Dr. Lyons is my personal cardiologist. █████████

May 6th test COVID positive and went to quarantine for 10 weeks. Had symptoms eventually tested negative twice. While away had cellulitis in my right hand index finger but they never cultured it; just shot me up with antibiotics for 10 days█████████

August 12th, after I was back in the camp, I submitted a form (don't have the copy) for the dermatologist, Cardiologist and eye doctor. by chance the eye doctor/tech came in a few days later and I did have an eye test. I never heard again about the cardiologist or dermatologist. I had also said I need to have an echo to check my heart valve which I have every year; it was part of a study at Mr. Sinai for the type of calcium preventing coating. Never had that either; also require blood work. Nope.

Augsut 25th - asked again about cardiologist; told that he won't come here. Can do a zoom meeting. we don't have that capability here.

September 15th. Asked the dental tech about my tooth and missing cap. Said to submit form. I did. Never heard back.
September 24, submitted another form for the cardiologist. Have that copy. Same story

████████████████████████████████████ they have not tested anyone at the Camp since
May 7th. █████████████
Note that I still have excessive gastric issues, I had complained about my leg swelling and have no idea if there are any lingering cardiac issues from having been infected. Basically, no one knows how long or what side effects can be and I'm not saying I have them but they seem coincidental.
█████████████████████

>



# EXHIBIT K



**ENGLEWOOD HEALTH**
PHYSICIAN NETWORK

Cardiovascular Consultants
of North Jersey

111 Terrace Avenue, Suite 317
Hasbrouck Heights, NJ 07604-3110
Tel 201 288 4252
Fax 201 288 7373

November 24, 2020

To Whom It May Concern:

Mr. Gary Basralian is a patient under my care for coronary artery disease, status post coronary artery bypass graft surgery, aortic valve replacement, hypertension and hyperlipidemia.

By report he has been suffering from hypertension, edema and headaches.

Medical care, testing and follow up visits are important given Mr. Basralian's various health issues. He appears to be having noteworthy cardiac complaints and should be evaluated.

Sincerely,

William J. Lyons, MD

WJL/er

# EXHIBIT L

## Tamra Katcher

| | |
|---|---|
| **From:** | BASRALIAN GARY (71610050) |
| **Sent Date:** | Thursday, November 5, 2020 5:34 PM |
| **To:** | tkatcher@remlawgroup.com |
| **Subject:** | update |

## Tamra Katcher

Tamra



I am the oldest inmate in this Camp. I am one of 3 over the age of 70. There are another 9 or so between the ages of 60-69. Everyone of us has medical conditions that fall under the AG's original and subsequent directive and under the CDC's concern

Thank you.
Gary Basralian

# EXHIBIT M

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3

4    UNITED STATES OF AMERICA       :      Criminal No.
                                           18-cr-515-MCA
5                v.                  :
                                           TRANSCRIPT OF
6    GARY BASRALIAN,                 :        SENTENCING

7                Defendant.   :
     ------------------------------x

8

9

10                                   Martin Luther King Courthouse
                                     50 Walnut Street
11                                   Newark, New Jersey
                                     September 6, 2019

12

13

14   BEFORE:

15        THE HON. MADELINE COX ARLEO, U.S.D.J.

16

17

18

19

20                                   Reported by:
21                                   CHARLES P. McGUIRE, C.C.R.
                                     Official Court Reporter
22

23

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
25

CHARLES P. McGUIRE, C.C.R.

2

1    APPEARANCES:

2           COURTNEY A. HOWARD, Assistant United States Attorney
            970 Broad Street
3           Newark, New Jersey 07102
            On behalf of the Government
4
            PETER R. WILLIS, Esquire
5           921 Bergen Avenue
            Jersey City, New Jersey 07306
6           And
            FASULO BRAVERMAN & DiMAGGIO, LLP
7           225 Broadway
            New York, New York 10007
8           BY: SAMUEL M. BRAVERMAN, ESQ.
            Attorneys for Defendant
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          (Defendant present)

2                THE COURT CLERK:  All rise.

3                THE COURT:  All right.  Good morning, everyone.

4                We are here in the matter of United States of

5     America v. Gary Basralian to impose sentence today.

6                Could I have appearances, please?

7                MS. HOWARD:  Assistant United States Attorney

8     Courtney Howard for the Government.

9                THE COURT:  Everyone can be seated in the back of

10    the courtroom.  Thank you.

11               All right.

12               MR. BRAVERMAN:  Sam Braverman and Peter Willis for

13    Mr. Basralian, who is seated immediately to my right.

14               THE COURT:  All right.  So, we're here today to

15    impose sentence.

16               Let's begin by reviewing the documents that I

17    received to make sure I have everything.

18               I have the final presentence report that was

19    prepared on May 2nd, 2019.  I believe there was an addendum

20    to that report as well.

21               I have a letter from the Government, dated August

22    30th of 2019.

23               Also submitted to me are a number of letters from

24    victims, and a letter from Mr. Willis, dated August 21st,

25    2019, asking for permission to be heard today, which I told

4

1    him in chambers a minute ago that I would certainly extend

2    him that courtesy today.

3           I also have a letter -- both the letters that I

4    have, I have a letter from Patricia Czmyr, dated March 1st,

5    2019; I have a letter dated January 20th, 2019 from a Gene

6    Gernais (ph); I have a letter from Judith Siegel, dated

7    February 18, 2019; a letter from Toni FitzMorris, dated

8    February 18, 2019; Wendy Downing, February 13th, 2019; a

9    February 13th letter from Carol Carter; a Cathy Carter

10    letter, dated February 12 of 2019; a letter from Ms. Vergara

11    dated February 5th, 2019, who I believe is Mr. Basralian's

12    present wife, and I have a letter from Mr. Basralian, dated

13    April 17th of 2019.

14           I also received a submission from defense counsel,

15    dated June 4th, 2019, and attached thereto are a number of

16    letters that are set forth on page seven of his letter to

17    the Court.

18           I note a number of letters from family, friends,

19    and colleagues that the Court has also received and

20    reviewed, and they have all been considered by the Court in

21    connection with today's sentencing.

22           Is there anything else that I missed?

23           MS. HOWARD:  Nothing from the Government, Your

24    Honor.

25           MR. BRAVERMAN:  No further submissions from the

5

1   defense, Your Honor.

2             THE COURT:  Okay.  So, let's begin with the

3   Sentencing Guideline range.

4             So, I will begin by noting that the -- we can

5   follow along, I guess, with the Probation report, it's on

6   page 21, and there are a couple disputes between the parties

7   in terms of -- there's no dispute on the criminal history;

8   correct?

9             MS. HOWARD:  That's correct, Your Honor.

10            THE COURT:  Okay.  So the issue is the offense

11  level.

12            Probation has calculated it as a 28.

13            To begin, they have added a special offense

14  characteristic.  They've added an 18-level increase, finding

15  that the loss was more than $3.5 million but less than

16  $9.5 million.

17            At the plea, the parties stipulated that the loss

18  was between 1.5 and 3.5, which would only require a 16-level

19  increase.

20            I'm inclined to accept the stipulation of the

21  parties at the plea and only include a 16-level increase.

22  So I am not accepting Probation's recommendation.  I'm going

23  to accept the stipulation at the plea.  That will be a 16.

24            There are two additional adjustments that the

25  Government has requested.  One was also included by

CHARLES P. McGUIRE, C.C.R.

6

1    Probation, and it's based on the fact that the offenses

2    involved vulnerable victims and would result in a two-level

3    increase, and the second one is substantial hardship to

4    victims, which would also amount to a two-level increase,

5    and I understand that that was not addressed at all at the

6    -- these two issues were just simply not addressed at the

7    plea, and the Government set forth the factual basis for

8    both of those adjustments.

9            I understand that the Defendant opposes those

10   adjustments, so I'll let defense counsel be heard, and then

11   I'll let the Government respond.  Okay?

12           MR. BRAVERMAN:  Well, Judge, I do object to the

13   two enhancements that the Court has proposed or that

14   Probation has proposed and the Court is reviewing at this

15   point.

16           Most importantly, so there are facts that sound

17   terrible, and there are facts that are as it relates to

18   vulnerable victims and substantial hardship.

19           What we know, for example, is that the victim who

20   lost the largest amount of money in this case here,

21   Probation has wrote and the Government has written that she

22   is, you know, that she has a substantial mental impairment

23   as a result of that whole condition and that this has made

24   her substantially vulnerable to the Defendant abusing his

25   position of trust with her.

7

1          What we also know, Judge, as a matter of fact, is

2     that she continued to run a business, that there were

3     business decisions that were totally independent of the

4     Defendant that he had nothing to do with whatsoever, and

5     that she exercised totally normal dominion and control of

6     the business interests, and that she performed those

7     business interests to the best of her abilities, and that

8     she was able to satisfactorily complete all those.

9          So the facts that are alleged are not supported by

10     the facts --

11          THE COURT:  Well, let's break that down, because

12     the adjustment requires vulnerable victims, which I imagine

13     is at least two victims who are vulnerable, and the

14     Government has pointed to six.

15          So, you're talking about the first victim, LD, who

16     is the 81-year-old who suffers from dementia?  Is that the

17     one you're contesting?

18          MR. BRAVERMAN:  No, Judge, I'm contesting a

19     different one.  The problem is that there -- I mean, I'm

20     happy to use names.  I assume you prefer not to.

21          THE COURT:  Well, we have initials, and that's

22     what the Government has used, and I assume that they're

23     initials of their names.  So instead of saying their names,

24     we can just use their initials.

25          LD, CC, JL, JLS, PAC, and JNJ are in the

8

1   Government's brief.

2        MR. BRAVERMAN:   It's page two in the Government's

3   papers.

4        THE COURT:   I don't know what page it is.

5        Page three.

6        MR. BRAVERMAN:   Page three.

7        The one I was referring to, Judge, is the second

8   one, identified as CC in the Government's papers, and that

9   is the one for the vast majority of the conduct here that we

10  are concerned.

11       THE COURT:   She is the one who years earlier had a

12  closed-head trauma, it look like, a near-death car crash,

13  "head injuries rendering me incapable of continuing my

14  advertising career in Newark, in Manhattan, and losing my

15  husband in a plane crash."

16       MR. BRAVERMAN:   Yes, that's correct, Judge.

17       THE COURT:   Okay.

18       MR. BRAVERMAN:   She's the one who then went on to

19  manage and close the business that was related, she was the

20  one who ended up managing and closing and addressing other

21  business interests, which she did independent of my client.

22       THE COURT:   Okay, and what about the other victims

23  that are listed here?

24       (Off the record discussion between the Defendant and

25  defense counsel)

9

1    MR. BRAVERMAN:  So, Judge, reviewing the

2    Government's papers here, I see the first one listed as LD,

3    and the second one is CC, the third, JL, the fourth, JLS,

4    the fifth, PAC, and the sixth, JMJ.  There are no facts that

5    are alleged here that suggest that they're vulnerable, other

6    than their age.

7    THE COURT:  In your mind, what kind of facts

8    suggest vulnerability, because -- let me read them for the

9    record.

10   LD is 81 years old and suffers from dementia.

11   That speaks to me of vulnerability.

12   MR. BRAVERMAN:  Right.  I didn't address that one.

13   THE COURT:  Okay.

14   MR. BRAVERMAN:  The ones I identified were two,

15   three, four, five, and six, and I was going to come back to

16   one.  So I was addressing three, four, five, and six, JL,

17   JLS, PAC --

18   THE COURT:  JL is 81 years old.  The Defendant

19   took over investments when her husband died.  She described

20   the personal relationship that they shared:  He would come

21   to her house rather than having her come to his office; "I

22   would make him cookies"; how deeply he violated her trust,

23   because she gave him complete access to her finances and

24   trusted him completely.

25   That does not speak of vulnerability?

10

1          MR. BRAVERMAN:  It does not, Your Honor.  My

2   mother is 83, and --

3          THE COURT:  We're not here to talk about your

4   mother.

5          MR. BRAVERMAN:  Okay.

6          THE COURT:  We're here to talk about -- all right.

7   That's your argument.  That's all.

8          Okay.  What else?

9          MR. BRAVERMAN:  So, number four, JLS, is a retired

10   woman who has known the Defendant since 1988.  She described

11   him as "one of my closest friends" whose financial advice

12   she trusted.  Over 10 or 12 years, he stole approximately

13   1.4 million from her.  There's nothing here that addresses

14   vulnerability.

15          Similarly, victim PAC is a 71-year-old woman.  She

16   describes him as someone she trusted and has known for 20

17   years.  There's nothing that makes her vulnerable.

18          Victim JMJ is a 73-year-old woman who has been

19   widowed with four children since she was 46 years old.

20   There's nothing here that makes her a vulnerable victim.

21          Instead of addressing number one, I'll address

22   number two.

23          Addressing number one, dementia is obviously

24   something that would make her a vulnerable victim, but the

25   question is whether she had dementia when she dealt with my

CHARLES P. McGUIRE, C.C.R.

11

client.   If she has dementia now but didn't have it at the

time she dealt with my client, then that would make her not

a vulnerable victim at the time of the crime.   She might be

today.

     And so I would object to that one as well, or I

object to that -- that enhancement.

     MS. HOWARD:   Your Honor, if I could respond

briefly.

     Judge, the vulnerable victim enhancement pursuant

to 3A1.1(b)(1), the comments -- well, the adjustment allows

for an increase of two levels if the Defendant knew or

should have known that the victim of the offense was a

vulnerable victim.

     The application notes, number two describes a

vulnerable victim as a person who is, quote, "unusually

vulnerable due to age, physical or mental condition, or who

is otherwise particularly susceptible to the criminal

conduct."

     Your Honor, as the Government described in the

letter dated August 30th, the victims of the Defendant's

crimes were selected particularly because they were less

likely to ask questions about their finances.   He picked

women, usually widowed or single, who, according to

interviews, gave complete control of their finances over to

the Defendant without asking questions because they trusted

12

1   him, and they trusted him, Your Honor, because the Defendant

2   befriended them, and it is because of their age, their

3   station in life, and the fact that he was their trusted

4   financial adviser who then also became friends with these

5   people, and they trusted him, that then made them, quote,

6   "particularly susceptible" to his criminal conduct.  He did

7   it in a calculating way, and this is exactly the type of

8   conduct that this offense enhancement adjustment is meant to

9   apply.

10          We have not one but one, two, three, four, five,

11  six victims here who have given statements explaining why

12  they were particularly susceptible to his criminal behavior

13  because of the position that he had and the friendship that

14  he gave them.

15          So, Your Honor, the Government believes at least

16  two points should be applied pursuant to that enhancement.

17          THE COURT:  All right.  I'm looking at the

18  guideline and the commentary at 3A1.1, which speaks of

19  vulnerable victim:  "If the Defendant knew or should have

20  known that the victim of the offense was a vulnerable

21  victim, increase by two levels."  And it says a vulnerable

22  victim meaning "a person who is usually vulnerable due to

23  age, physical or mental condition, or who is otherwise

24  particularly susceptible to criminal conduct."

25          I'm satisfied that the Government has demonstrated

CHARLES P. McGUIRE, C.C.R.

13

at least two of these victims fall within this enhancement.

The Guidelines speak to age, physical and mental condition, or who was otherwise particularly susceptible to the criminal conduct.

So at least two of the victims are in their 80's. One of them suffers from dementia, and, although we don't have a precise date of the onset of dementia, her age alone would suggest that she -- with some mental health issues at some point would suggest that she suffers from -- that she is a particularly vulnerable victim.

The second victim, the standard is not, incapacitated; the standard is not someone who is in a guardianship position.  The standard is, vulnerable.  And someone who has had a 30-year relationship, and their personal story begins with a near-death car crash and injuries that caused her to lose her career, and losing her husband in a tragic situation like a plane crash, despite the fact that she may have been able to -- I accept Defendant's proffer that she may have been able to go on and do other things to advance the business interests.  Those other factors nonetheless demonstrate that she is vulnerable as that phrase is defined by the guidelines.

Likewise, the third victim, an 81-year-old woman who Defendant took over her investments after her husband died, they had a personal relationship, and he knew that,

14

and knew that she was older and that she was a widow, and
that falls within the description of vulnerable victim.

Similarly, the other victims are people that had
developed close relationships of great trust and were
elderly or older.  Although I agree with you that 71 and 73
are certainly not the same as someone in their 80's or even
older, these are people that, at least one was widowed, they
were in their retirement years, they had a close
relationship with the victim, and I'm satisfied that they
also fall within the description of a vulnerable victim.

And, because I find that at least two of these
victims apply, I am satisfied that the enhancement for
vulnerable victim is appropriate here, and I'm going to
increase it by a two-level enhancement.  Okay?

So the second adjustment that the Government is
seeking is substantial hardship to the victim.

And, while Probation did not find this enhancement
in their report, the Government has requested that it apply
here, and they outline on page four of their brief why this
adjustment should apply.

I understand the Defendant opposes it, and I will
hear from the Defendants.

Like the other one, they point to, I think, three
victims who they assert fall within this enhancement.

MR. BRAVERMAN:  One second, Your Honor?

15

1       (Off the record discussion between the Defendant and

2    defense counsel)

3           MR. BRAVERMAN:   Judge, I think -- I do not have

4    the financial statement of each of these individual victims,

5    and I'm not in a position to tell the Court that I know what

6    they have and how much money they have.  The conclusions

7    that they raise, they sound like legitimate conclusions

8    under the statute here.  I don't have anything to verify

9    that.  I don't have anything to say that their final

10   position -- is greater than a million dollars, and so it

11   really is -- it certainly can be that they feel that they

12   have lost a substantial hardship, but as a matter of

13   financial position, if their position is that they still

14   have net worth greater than a million dollars, does that

15   create a --

16          THE COURT:  Well, let's go back to the guideline.

17          Under 2B1.1, the note 4(f) gives us some guidance:

18   "In determining whether the offense resulted in substantial

19   financial hardship, the Court shall consider, among other

20   factors, whether the offense resulted in the victim becoming

21   insolvent; filing for bankruptcy...; suffering substantial

22   loss of a retirement, education, or other savings or

23   investment funds; making substantial changes to his or her

24   employment, such as postponing his or her retirement plans;

25   making substantial changes to his or her living

16

1     arrangements, such as relocating to a less expensive home;

2     and suffering substantial harm to his or her ability to

3     obtain credit."

4              So, in support of that, this is what the

5     Government proffers.

6              Victim JL had to sell her home last year because

7     the Defendant stole from her retirement fund, so she had to

8     downsize.  She had been in her home for 50 years.  She now

9     lives in a small home in a retirement community and is not

10    able to purchase furniture or curtains.  In addition, she

11    needs $8,000 in dental work and she cannot afford and has

12    put off medical tests.

13             Two, victim PAC has to postpone her retirement and

14    is still working full time at age 71 because of the

15    Defendant's actions.

16             Three, victim JNJ also had to postpone her

17    retirement and continues to work at age 73.  She had to sell

18    her current home, which she had purchased and completely

19    redone with the intent to live there permanently.  She had

20    to move to a small, less expensive area and home.

21             So these facts were set forth, I believe, in the

22    final presentence report, which you had the right to object

23    to, which I have full faith that the Probation Department

24    fully vetted, and met with the victims and recorded that

25    information.

17

1          They also as victims submitted letters, which I

2     referenced earlier, that corroborate those facts.

3          So the standard under the Guideline is not how

4     much money is left.  It's not a spreadsheet.  It's what I

5     said and what the Government pointed to:  Having to change

6     living arrangements, having to make substantial plans to

7     your employment, such as postponing retirement, and

8     suffering a substantial loss to your savings, and those are

9     the things that have been pointed out by the Government in

10    their letter.  All right?

11         So, anything you want to add?

12         From the Government?

13         MS. HOWARD:  No, Your Honor, just that those fall

14    squarely within the enhancement.

15         THE COURT:  This is not even a close call.  These

16    fall squarely within the enhancement.  These are victims, as

17    described both to the Probation Office and to the Court in

18    letters.  Victim JL had to sell her home, had to downsize

19    from a home she had been in for 50 years; victim PAC had to

20    postpone retirement and is still working full time; and

21    victim JNJ had to postpone retirement and continues to work

22    at age 73.  She also had to sell her current home.

23         Those victims fall squarely within enhancement

24    2B1.1 as demonstrating a substantial financial hardship.

25         I accept that enhancement, and that puts us at an

18

1    offense level conduct of 28, and a Guideline range of 78 to

2    97 months.

3              MS. HOWARD:  Your Honor, just one note for the

4    record.

5              THERE was one enhancement that was stipulated to

6    in the plea agreement.

7              THE COURT:  Yes, you're right, and that was for

8    the securities broker.  Okay.  So I was only addressing the

9    ones that were raised or objected to in the submissions by

10   Defendant; and I think there is no objection to the fact

11   that he was a securities broker, or the level 16 for the

12   loss amount.  Okay?

13             So, would the Government like to be heard first in

14   terms of sentence?

15             So, the Guideline range is between 70 -- I should

16   say between 78 and 97 months.

17             Just to put it in context, and I'll let everyone

18   be heard, Defendant has asked for a sentence substantially

19   below the guidelines.  They have asked the Court to vary,

20   and they've asked to impose a sentence of not more than 30

21   months on each count, and the Government has asked for a

22   guideline sentence at the upper end of the guideline range.

23   Okay?

24             I will hear first from the Government, and then I

25   will let, certainly, defense counsel and Mr. Willis as

19

co-counsel and a personal friend as well as the Defendant be

heard.  Okay?

        MS. HOWARD:  Thank you, Your Honor.

        Your Honor, the Defendant's conduct in this case

is, frankly, among the most egregious of frauds.

        The Defendant was an investment adviser, he was in

a position of trust, and over the course of 10 years, he

stole over 3.7 million from at least 10 of the clients.

        The Defendant's actions were not isolated.  They

were not a mistake.  This was not a lapse in judgment.  This

was sustained, calculated abuse of his position of trust.

It was methodical, and it was destructive.

        The Defendant, Your Honor, selected his victims

from his clients to find the ones who trusted him the most,

to find the victims who were the least likely to ask

questions, and, when they did ask questions, the most likely

to trust him when he said, don't worry about it, I've got it

under control.

        The victim here all shared a similar profile.

They were all women, they were usually single or widowed,

and they're now in their 70's or 80's.  Uniformly, in the

Government's interviews of these victims and in the

statements that they provided to Probation and in the

letters, these women trusted the Defendant completely, in

part because of the length of time that they had known the

20

1    Defendant, and because of the Defendant's actions in

2    befriending them, in taking their relationship beyond that

3    of an investment adviser, which is already a position of

4    trust, but even further, to close friends with these women.

5    He went to their homes.  He took them out to dinners.  The

6    Defendant did this deliberately.

7              The ways he stole money varied.  Sometimes he

8    simply wired money directly out of their accounts, at times

9    forging signatures in order to do so.  At other times, he

10   would direct his clients to write checks to entities he

11   controlled, representing that the funds would be invested

12   and go into the investment accounts.  When one victim began

13   asking questions about the diminishing returns in her

14   account, the Defendant created a fake document to cover up

15   his crimes and showed purported investments in real estate,

16   high-interest loans, and securities that were all false.

17             The Defendant -- one of the victims' statements I

18   do want to point out to Your Honor, one of the victims

19   described asking the Defendant questions and described her

20   daughter asking questions about the trust that she was

21   putting in the Defendant, and described his response to that

22   to keep her finances to herself, don't talk to her daughters

23   about it, he had it under control, and that was so that he

24   could keep stealing from her.

25             And the Defendant used that money for his own

1   purposes - thousands of dollars to BMW, tens of thousands of

2   dollars to personal credit card bills, car payments,

3   mortgage payments.  He was funding his own life from the

4   retirement funds of these women, who have worked hard, who

5   had been in accidents and received money from settlements

6   because they had been injured and were relying on that money

7   to live.  He was taking it and funding his own lifestyle.

8           The other issue here that really calls for a

9   sentence at the top of the Guideline range of 97 months is

10  the betrayal that he caused to these victims, and they

11  described it in the emotional pain that they suffered in

12  addition to now the financial losses.

13          Victim CC describes the betrayal by a trusted

14  friend.

15          Victim JL states that it's very emotional and

16  stressful.  She writes:  "Basralian violated my trust, and I

17  don't think I will ever be able to get over that.  I trusted

18  him completely and I believed he was my friend.  The life

19  change since the beginning of this has been difficult.  I am

20  depressed, I developed anxiety, and I do not sleep at night.

21  The stress has taken a toll on my memory, and so I become

22  more reliant on my children because I doubt myself."

23          Victim JLS described how she considered Basralian

24  one of his closest friends.  She said:  "I believe

25  Mr. Basralian should be held responsible, not only for the

22

1   financial losses I have incurred, but also for the immense

2   pain and sadness that his betrayal of my trust engendered.

3   Financial advisers play an important and intimate role in

4   their clients' lives.  That one should betray that trust and

5   responsibility is not acceptable."

6       Victim PAC calls the Defendant, quote, "a shrewd,

7   manipulating liar."  She writes, quote:  "After many years

8   of savings, my anxiety level is so high because of losing my

9   retirement and other funds by this deceit.  These are the

10  consequences which I have to live with for the rest of my

11  life.  To live this over and over is devastating.  There is

12  not a day that goes by where the thoughts of his actions

13  result in my difficulty sleeping and concentrating, which

14  affect my daily life.  The emotional stress is overwhelming,

15  along with feeling so betrayed.  His sentencing should have

16  no limits.  He is the one who has mastered being deceitful,

17  taking full advantage of the situation."

18      So, the conduct itself, Your Honor, in looking at

19  the 3553(a) factors of the seriousness of the offense and to

20  provide just punishment of the offense, this was, again, the

21  most heinous of frauds, and should be viewed that way in

22  fashioning a sentence.

23      Second, Your Honor, in speaking about the history

24  and characteristics of this Defendant, he has had, according

25  to the information in the PSR, every opportunity to succeed,

23

1    but instead of taking advantage of his station in life, he

2    chose to just steal from others.  He took advantage of

3    others who have saved sometimes for decades to put money in

4    retirement and to fund his own lifestyle.  Again, it was

5    conduct that took place over 10 years.  It was repeated

6    theft, it was repeated lies, and it was repeated inducement

7    to trust.

8           I also want to note, Your Honor, some information

9    that was contained in the PSR, which, again, the final PSR

10    did come out on May 2nd of 2019, so some months ago, and

11    that has yet to be addressed by the defense.  It appears

12    from information in the PSR that Defendant misled Probation

13    about potential assets for satisfying restitution.

14           At the time of his presentence interview on

15    October 24th, 2018, he indicated that he jointly owned a

16    home with his -- I believe his first wife in Millburn,

17    New Jersey.  According to the PSR, that home was sold on

18    February 14th of this year for $730,000, and as of this

19    date, the Probation Office did not have any information

20    about the accounting from that sale as of the date of May

21    2nd and then also as of today.

22           Probation also obtained records from Pretrial

23    Services which revealed that the Defendant had requested

24    permission to travel to Puerto Rico to assess damage of a

25    property there of which the Defendant was a managing

24

1    partner.   He did not -- in his financial affidavit that he

2    provided to Probation, he did not indicate that this

3    property -- that he had this property or that he had

4    business holdings of which he was a managing partner.

5            So that concerns the Government, given -- in

6    evaluating the history and characteristics, that even now,

7    he can't be fully forthcoming about his assets.

8            Finally, Your Honor, just briefly, it is important

9    for deterrence purposes, general deterrence and specific

10   deterrence to Basralian that the Court sentence him to a

11   sentence at the top of the Guidelines range.   This is a

12   crime that the public should know that people who are in

13   positions of trust, like investment advisers, a very

14   significant position of trust where they have access to

15   funds and they're in this unique position to abuse the

16   finances of their clients, that they should be deterred from

17   doing so, and that a significant sentence will follow.

18           This is not a situation where there are mitigating

19   factors, frankly, Your Honor.   It's just greed.

20           And so, with that, Your Honor, the Government

21   submits that a sentence at the top of the Guidelines range

22   of 97 months is appropriate here.

23           THE COURT:   Thank you.

24           MS. HOWARD:   Thank you.

25           MR. BRAVERMAN:   Good morning, Your Honor.

25

THE COURT:  Good morning.

MR. BRAVERMAN:  Judge, I'm not going to start with where the Government started, but I will get to where the Government started and conclude there.

The first and foremost, Judge, I'd like to address is that it is unequivocal that Mr. Basralian's conduct was unacceptable, criminal, and must be punished.  There's no doubt.

And in Mr. Basralian's letter to the Court, Mr. Basralian's statements to Probation, which is quoted in several pages -- and I would say it was approximately 200 pages that was provided to Probation of background documents that related to the underlying actions with his prior spouse -- spouses.  That is unequivocal, and I just don't think that that could be contested.

The conduct should be punished; of course it should.  This Court, probably everybody in this room has saved a dollar somewhere, and they want that dollar protected.  There's no doubt that people who steal from those funds should be punished.  That's just first and foremost.

We are here today to determine what is the level of punishment, not that he should be.  Mr. Basralian will be punished in a host of ways that I ask the Court to consider as well to make sure that the Court reviews the entire

26

1    scheme of punishment.

2           That includes the fact that Mr. Basralian is going

3    to prison.  If it's a day, if it's a decade, he's going to

4    prison, and that separates him from the vast majority of

5    people in our country who have committed an offense and

6    don't go to prison.  He's going to go to prison, and he's

7    going to be there for -- in a Federal prison, where he's

8    going to be supervised, and he's going to have every

9    movement that he has in a day restricted.  He's going to

10   have no ability to care for his wife.  He's going to have no

11   ability to care for his brothers and sisters, who are here

12   today.  He's going to have no ability to care for his

13   children - none.  He's going to be a felon for the rest of

14   his life, which, at age 72, making him older than some of

15   the victims in our case, I guess that would make him a

16   vulnerable victim as well if he were a victim of a crime.

17          Nonetheless, he is going to be a felon for the

18   remaining let's say decade of his life.  Let's hope he lives

19   that long.  He's going to be somebody who will never be able

20   to participate in the field that he has for the past 40

21   years.  Now, that may be a good thing, but he doesn't have

22   any other skillsets.  He's not a car mechanic.  He's not a

23   builder.  He's going to have to learn something new to

24   provide for his family and to make restitution to the

25   victims of this case.  He's going to be under supervision

27

1    for no less than years, for sure.  He's going to have a

2    judgment over his head for the rest of his life.  There is

3    no chance that he's going to write a check that's going to

4    solve this problem.  It can't be done.  So every dollar he

5    makes for the rest of his life, before taxes are even

6    collected, he's going to have to pay those victims.

7            The good thing is that that's what he wants to do.

8    In his letter to the Court, as he described it, he wants to

9    make that restitution.  These people were, first and

10   foremost, they were friends of his.  They were no doubt

11   people he went to dinner with on a regular basis.  They were

12   people who wrote to him, even after he was arrested, who

13   wrote to him and they said they still want him to be in

14   their lives, who wrote to him and said they still want to be

15   coming to dinner with him or going to parties, or he was

16   even invited to a wedding.

17           So, there's no doubt that they're angry.  There's

18   no doubt that their anger is justified.  I do not ever want

19   to suggest that their anger is misplaced.

20           But the reality is, he has also a 40-year career.

21   One of the good things he did in his 40-year career is that

22   he actually built up the wealth of several of these people

23   who are now today victims of this crime.

24           So that's a little bit of the background of this

25   case.

28

1           It is not -- greed is, I think, a very simple way
2  to explain this because it matches our understanding of why
3  somebody would do a crime that we would not do, because
4  therefore it's easy to say that it's just greed, just
5  sociopathy.
6           But I don't think a review of the case, Judge,
7  actually supports that.
8           Remarkably, Mr. Sternberg, who was the prior
9  Probation Officer in this case and apparently is retired,
10  for reasons that I cannot understand, he never reached out
11  to my client's current wife.
12           So, why is that relevant?
13           So, he reached out to his ex-wife.
14           When we were at the Probation interview, my client
15  spoke at great length about the acrimony of the divorce. The
16  acrimony of the divorce has nothing to do with this case,
17  but it is certainly relevant to the context of this case in
18  the sense that it is the driving force for Mr. Basralian's
19  criminal conduct here.
20           In a completely Sisyphean task, he tried to create
21  a relationship with his son, notwithstanding the fact that
22  the son has absolutely no interest in having a relationship
23  with his father.  I have seen the thousands of texts between
24  the two of them, and it is simply not as the prior Probation
25  Officer reported.

CHARLES P. McGUIRE, C.C.R.

29

1              Remarkably, Judge, I actually called the Probation

2   Officer and wrote to him prior to the conclusion of his

3   report and immediately upon receipt of his report to ask him

4   why does he not return the phone calls of my client's

5   current wife, why does he not speak with her.  I never got a

6   response.

7               But on the day that the report was e-mailed to me

8   on March 29th, it was the next day, March 30th, I wrote to

9   Peter Sternberg to say, could you please explain to me why

10   you will not talk to my client's current wife, why you will

11   not reach out to family members?

12               And I never got a response.

13               It's a shame that the officer is not here today,

14   because I would address it to him directly.

15               THE COURT:  All right.  Well, I don't need to go

16   there, okay?  So let's stay on -- let's not use your time to

17   attack a Probation Officer who is not here.  You did not

18   write a letter to me or Probation, objecting to this.

19               MR. BRAVERMAN:  I did.  I wrote a letter to

20   Probation, objecting to it.

21               THE COURT:  And they responded.

22               MR. BRAVERMAN:  They did not.  They ignored it.

23               THE COURT:  And what did your letter say?

24               MR. BRAVERMAN:  "Dear U.S.P.O. Sternberg:

25              "I have received the Probation report for

30

1   Mr. Basralian and I will get back to you within 14 days with

2   our comments, but I have a preliminary question.  In your

3   effort to verify information provided to you, how come you

4   didn't interview his current wife, Soraya, who we know loves

5   him, and only spoke with the ex-wife, Jackie, who we know

6   hates him?  Some of the information that Jackie provided to

7   you is demonstrably false, and we will provide documents to

8   support our position.  I also understand that Soraya left a

9   message for you last week, seeking to speak with you, and we

10   had provided her contact info at the PSI several months ago,

11   but no contact between Probation and her was ever made.

12   Please let me no your thoughts.  Thanks, Sam."

13          That was sent on March 30th.  I have never

14   received a response.  Soraya has never received a response.

15          THE COURT:  Well, I can assure you, counsel, that

16   I have read his wife's letter to the Court, and I take that

17   in consideration, and I have read his letter and his lengthy

18   explanation of his marriage, and I take that into

19   consideration, too.  So I think we can move on from that

20   point.

21          MR. BRAVERMAN:  The point only, Judge, is that the

22   conclusion of the Probation report, I believe, is, in part,

23   based upon what I would say is an insufficient

24   investigation.  One of the things that this Court --

25          THE COURT:  So noted.  So noted, and you can move

31

1  on.

2          MR. BRAVERMAN:  So the next step in the 3553(a)

3  analysis is to examine under -- the first one is the nature

4  of the crime itself, which we have discussed.  The next one

5  is the nature and characteristics of the Defendant who is

6  accused of that crime.

7          So, Mr. Basralian at 72 years of age is not an

8  unformed person who just appeared out of nowhere in this

9  particular case.  What we do know is that he has an

10  extensive family.  The family is here today on the Court's

11  left-hand side.  We have my client's brother, one of my

12  client's sisters.  We have their spouses.  We have their

13  children.  They have all wrote letters, and the letters

14  write to this Court to explain an extensive history of two

15  important things.

16          The first one is generosity by Mr. Basralian to

17  the rest of the world, not just financial, because the Court

18  might conclude that the financial generosity was, in fact,

19  given because he had stolen money from somebody else, which

20  I don't think is supported in this case.  What it is

21  suggestive of is that he was generous with his love and

22  affection to lots of people around the world, that he went

23  out of his way on a regular basis to try and do things to

24  make other people's lives better.

25          And he succeeded, and the 30-some-odd letters that

32

1    I've sent to the Court are testaments to that.  They speak

2    repeatedly of different things that he did for other

3    people's lives.

4            They also repeatedly come back to a theme about a

5    bad decisionmaking process, that his process in an effort to

6    please other people, perhaps the source of that generosity

7    to make other people's lives better also drove him to make

8    terrible decisions.

9            Some of the decisions were choices of his spouse.

10    Some of those decisions were choices of how he spent money

11    -- not his current spouse, his prior spouse -- choices of

12    how he spent his money, choices in how he subjugated himself

13    to try and win over his son with his second wife that he has

14    utterly failed to be able to do.  And his letter to this

15    Court, I think, addresses that in very specific detail about

16    the choices he made in trying to salvage that, and he failed

17    utterly, and he failed utterly in the two worst ways:  He

18    has no relationship with that son, and he is a felon, about

19    to go to prison someday.

20            So, his goal was totally frustrated.  His means of

21    doing so were wrong.  But it is not inconsequential to who

22    he is.  That is still very important.

23            In terms of the deterrence specifically to him,

24    Mr. Basralian is deterred.  The Government here argues that

25    there's some level of deceit that's even portrayed today, so

33

1    I'd like to address that.

2              We had a conversation in chambers prior to the

3    call here.  The Court asked me to inquire, and I did

4    inquire.  I'll put on the record here what I inquired of.

5              So, the first question was about the property in

6    Puerto Rico.  It's my understanding that the property in

7    Puerto Rico, my client was an owner of shares of this LLC

8    that owned the property; that he transferred those shares to

9    a family member in a recorded event, a written document --

10             THE COURT:  What date was that?

11        (Off the record discussion between the Defendant and

12   defense counsel)

13             MR. BRAVERMAN:  It's my understanding, Your Honor,

14   that the -- I do not have a copy of the document, but it's

15   my understanding that the transfer occurred approximately in

16   2016.

17             THE COURT:  Okay.  The transfer for the

18   property --

19             MR. BRAVERMAN:  My client's shares in the LLC is

20   what he transferred out.  He owned shares.  He transferred

21   them out.

22             THE COURT:  In the property in Puerto Rico was in

23   '16?

24             MR. BRAVERMAN:  Yes, that's my understanding, Your

25   Honor.

CHARLES P. McGUIRE, C.C.R.

34

1          THE COURT:  Okay.

2          MR. BRAVERMAN:  And then the second question was

3    about a house which was a prior marital home, and my

4    understanding of that is that there was a divorce decree --

5    I think I actually said in chambers that it was my client's

6    second wife.  I believe the Court was correct:  My client's

7    first wife.  My client's first wife.  I was mistaken on

8    that.

9          There was a divorce decree that occurred in the

10   early part of this century, approximately 2002, that as part

11   of that settlement agreement that that marital home would be

12   sold.

13         That marital home was sold.  It's my understanding

14   that the proceeds of that house went to satisfy two

15   financial institutions' liens against the home that were in

16   part equity-secured.  There was one that was to a private

17   loan that was secured by the property and two private loans

18   that were not secured by the property, and all remaining

19   proceeds went to my client's ex-wife, and that my client

20   himself pocketed none of the money of that sale.

21         THE COURT:  Okay.  And just so the record is

22   clear, first, I invited the Government in, and as a

23   follow-up to the issues that were in the presentence report

24   and their August 30th letter under the section called

25   "Second," and they raised issues about the public sale of

35

1    the Millburn property -- that was raised by Probation -- and

2    the fact that he had requested permission to travel to

3    Puerto Rico to address property where he was a managing

4    partner raised questions.  I invited you in.  I appreciate

5    that you were able to get me a prompt response.  And

6    certainly that's on the record now, and, you know, whatever

7    issues -- whatever the Government does to consider his

8    restitution efforts, they will do.  And I appreciate your

9    getting me that answer, because it was left open in the

10   Probation report, and it was also left open in the letter to

11   the Government dated August 30th, and I appreciate the

12   explanation.

13            MR. BRAVERMAN:  Sure, Judge.  Can I inquire, did

14   Probation give the Court -- in its meeting with the Court,

15   did Probation give to the Court any facts that the Court is

16   going to consider as part of the sentence?

17            THE COURT:  The only facts that will be considered

18   were the facts that you just placed on the record, because

19   no one had any information other than you, sir.

20            MR. BRAVERMAN:  I apologize.  I mean beyond what I

21   just placed on the record here.

22            THE COURT:  There are no other facts.  They didn't

23   know; they had no information.  As you said, the writer is

24   retired.  The present Probation Officer didn't have any

25   facts.  The Government had no facts.  I called you in, and

36

1    you were kind enough to provide the Court the facts.

2                    MR. BRAVERMAN:  I appreciate that, Your Honor, and

3    then when the Government had an opportunity, did the

4    Government provide any --

5                    THE COURT:  Counsel, I said to you in chambers

6    before we met that I had no conversations -- I'm not sure

7    why you are persisting on this line of inquiry to the Court.

8    There were open questions about Mr. Basralian's finances.  I

9    asked the Probation writer -- I asked the Government did

10   they raise it, and you chose not to respond to it, and they

11   said they didn't know.  I told you this in chambers.  And

12   within a minute or two, we called you in, and you were kind

13   enough to get us that information.

14                   There was no other information considered by the

15   Court.  There were no -- any ex parte communications.  I

16   assured you that in chambers, and I assure you that today on

17   the record.

18                   So I'd ask that you move forward to another point.

19                   MR. BRAVERMAN:  Sure.  If I can just answer the

20   Court's question in one sentence, which was, the Court

21   inquired, why am I pursuing this.  It's just in my

22   experience, I've never had the experience --

23                   THE COURT:  And you told me that off the record in

24   our meeting, and I explained to you I had a question, and I

25   asked for it.  So let's move on.

CHARLES P. McGUIRE, C.C.R.

37

1          MR. BRAVERMAN:  I just note that I object.

2          THE COURT:  So noted.

3          MR. BRAVERMAN:  Thank you.

4          THE COURT:  Please move on.

5          MR. BRAVERMAN:  So the next thing under 3553(a)

6    is, I mentioned specific deterrence.  There's now general

7    deterrence.

8          So general deterrence is, we have two members of

9    the press here today that I am sure are going to report on

10   this, and when the press reports on this, they're going to

11   report that Mr. Basralian will be sentenced to prison.  They

12   will report that he will be sentenced to a financial

13   forfeiture order, a restitution order, a bar from the

14   industry, that he will be a felon for the rest of his life.

15   So they will report these important factors that other

16   people who are in a situation that might be similar to

17   Mr. Basralian's and they will know that if you commit a

18   crime like this, you go to jail, that if you commit a crime

19   like this, that you're barred from the issue of the work.

20   So the general deterrence question is addressed by this, in

21   part, by the length of the sentence, to be sure, but all of

22   the other factors are the things that are generally

23   deterred.  The vast majority of society stays out of trouble

24   not because they're going to get caught, but because they

25   don't want to be punished, because they generally speaking